**Charles F. COOPER**

v.

**Philip J. PICARD.**

**Misc. Civ. No. 69–64–F.**

United States District Court,
D. Massachusetts.

Aug. 31, 1970.

John C. Cratsley, Cambridge, Mass., for plaintiff.

Lawrence P. Cohen, Asst. Atty. Gen., Mass., Boston, Mass., for defendant.

## OPINION

WYZANSKI, Chief Judge.

This case is here on remand from the Court of Appeals. Cooper v. Picard, 1st Cir., 428 F.2d 1351, June 29, 1970.

Cooper is confined by Picard in the Massachusetts Correctional Institution at Norfolk, pursuant to a sentence of 5 to 7 years for armed robbery imposed by Mr. Justice Kalus of the Superior Court of the Commonwealth of Massachusetts, and affirmed by the Massachusetts Supreme Judicial Court. Commonwealth v. Cooper, 1969 Mass.A.S. 857, 248 N.E.2d 253.

His petition in this court for a writ of habeas corpus alleges that he is held in violation of the Sixth and Fourteenth Amendments to the United States Constitution because witnesses who identified him in court depended for their identification upon an impermissibly suggestive pre-trial showup of the defendant by the police at a time when, although he was in custody, he had no counsel.

Chronologically this opinion deals with the state court trial, the appeal to the state Supreme Judicial Court, the petition in this court, the decision of Judge Ford upon the petition for a writ of habeas corpus, the opinion of the Court of Appeals, and the trial in this court after remand.

Mr. Justice Kalus of the Superior Court of the Commonwealth, sitting without a jury, heard evidence with respect to a March 4, 1968 robbery by two men of a Cambridge pharmacy owned by Mr. Jacobson. Mr. Jacobson and his wife were the only witnesses of the robbery, and each of them testified as to

his or her observations and each gave a courtroom identification of Cooper as one of the robbers. In addition, Mr. Jacobson testified as to a pre-trial identification, on the day following the robbery, of a photograph of Cooper as a photograph of one of the robbers. On cross-examination, Mr. and Mrs. Jacobson each testified in some detail [State Tr. pp. 28–29, 38–39] that on March 20, 1968 they had separately viewed Cooper at the Cambridge police station, first through a one-way mirror, and then face-to-face. Defense counsel asked for "a hearing to be held on my motion to exclude the testimony of Mr. Jacobson and the testimony of Mrs. Jacobson * * * [o]n the basis of the case of United States v. Wade, [388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149]". [State Tr. p. 52, but see Cooper v. Picard, p. 1352 of 428 F.2d, last paragraph, third sentence]. It does not appear that with respect to the March 20 police station confrontation counsel had evidence to offer in addition to the cross-examination. The Superior Court judge, without explicitly stating that he found the courtroom identifications had an origin independent of the March 20 police station showup, denied the motion. Cooper was convicted and he appealed to the Supreme Judicial Court "on the single contention that eyewitness testimony identifying Cooper as one of the robbers was inadmissible under United States v. Wade, 388 U.S. 218, [87 S.Ct. 1926, 18 L.Ed.2d 1149]; Gilbert v. California, 388 U.S. 263, [87 S.Ct. 1951, 18 L.Ed.2d 1178], and Stovall v. Denno, 388 U.S. 293, [87 S.Ct. 1967, 18 L.Ed.2d 1199]." [See the second paragraph of the opinion in Commonwealth v. Cooper, supra].

In a careful opinion, Mr. Justice Kirk, writing for a court composed of Wilkins, C. J., and Spalding, Whittemore, Cutter, and Kirk, JJ., first summarized the evidence. Then he said that the trial judge had entertained the motion mentioned above, "nevertheless consented to consider the issue of identification under United States v. Wade, 388 U.S. 218, [87 S.Ct. 1926, 18 L.Ed.2d 1149]

in the event that the evidence elicited during the trial warranted it, that he did so consider the issue, and thereupon denied the motion." [p. 862, 248 N.E.2d p. 258]. Next, the Supreme Judicial Court held that because on March 20, 1968 Cooper was in custody, although not as yet indicted for the drugstore robbery, "[he] was entitled to be informed of [the] * * * prospect [of a showup at the police station,] and of his right to have counsel present." [p. 865, 248 N.E.2d p. 259]. Mistakenly (see Cooper v. Picard, 428 F.2d p. 1353, note 1), Judge Kirk said that Cooper did "not attribute any unfairness to the procedure resulting in his identification * * * at the station house". [p. 865, 248 N.E.2d pp. 259–260]. The opinion in its penultimate paragraph (p. 866, 248 N.E.2d p. 260) found that "The testimony revealed that both Jacobsons had more than adequate opportunity to observe the criminals and had ample capacity to remember what they observed. Further, when shown five or six boxes of photographs the day after the crime Jacobson did not pick out anyone as Cooper. When shown another photograph with a folder he identified it without hesitation as Cooper. There was no confusion of identity prior to the observation at the station house; there was no failure to identify Cooper at any time. On this evidence *we are convinced* beyond a reasonable doubt (see Chapman v. California, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L.Ed.2d 705) *that the Jacobsons' in-court identifications were based not on the confrontation at the police station, but rather on observations of the accused at the time of the robbery.* There was no error in permitting the in-court identification to stand." [Emphasis added.] The judgment of conviction was affirmed.

Cooper thereupon filed in this court the present petition for a writ of habeas corpus. He alleged that the penultimate paragraph of Justice Kirk's opinion was a mere conclusion of law unsupported by clear and convincing evidence in the record; that the record was barren of

any detailed exploration of the circumstances of his illegal confrontation; and that he was entitled to be discharged from state custody or given a full evidentiary hearing either in this court or the Commonwealth Superior Court to determine whether the in-court identifications are independent or should, in fact, be excluded from use against the petitioner.

When the petition came before District Judge Ford he did not hold an evidentiary hearing but examined the state court record, wrote an opinion based thereon, and denied the writ. His view was that the record showed that the prosecution had borne the burden of proving by clear and convincing evidence that the in-court identifications had an origin independent of the police station confrontation. Judge Ford referred to the length of time the witnesses observed the robbers, the lighting of the place of observation, the proximity of the witnesses to the robbers, and Mr. Jacobson's identification of a photograph of Cooper on the day after the robbery. Judge Ford also said that the Jacobsons "noted distinctive characteristics such as sallow skin, pockmarked face and pulled in cheeks".

On appeal, the Court of Appeals reversed Judge Ford and held that the District Court could not deny the petition for a writ of habeas corpus without an evidentiary hearing.

The Court of Appeals opinion first dealt with Mr. Jacobson's identification of the photograph of Cooper on the day after the robbery—a point not raised by the petition for the writ of habeas corpus, but adverted to in the briefs. The court held that the March 5 photographic identification was not "unduly suggestive". [428 F.2d p. 1352].

The court then turned to consider whether under Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770, Judge Ford was required to hold an evidentiary hearing on the petition for a writ of habeas corpus. Unlike the Supreme Judicial Court [p. 862, 248 N.E.

2d 253], the Court of Appeals [428 F.2d p. 1353] regarded Superior Court Kalus's denial of a motion to strike the testimony of Mr. and Mrs. Jacobson as not the equivalent of an explicit finding that their in-court identifications were independent of the pretrial identification procedures. Then the Court of Appeals went one step further: despite what the Supreme Judicial Court said in its penultimate paragraph, and despite the Court of Appeals' own statement [428 F.2d p. 1353] that the Supreme Judicial Court had affirmed Cooper's conviction "on the ground[s] * * * that an independent basis for the in-court identification was established at trial"; the Court of Appeals said that "The Supreme Judicial Court did not hold that the in-court identification was independent of an impermissibly suggestive showing at the police station, *for it assumed that the only objection to the showing was lack of counsel.*" [428 F.2d p. 1353, note 2 (emphasis added)]. It is difficult for this court to appreciate the significance of the last clause just emphasized. Both Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 and Clemons v. United States, 133 U.S.App.D.C. 27, 408 F.2d 1230, apply to in-court identifications alleged to have their origin in impermissibly suggestive pre-trial showings the same standards and techniques as United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 applies to in-court identifications alleged to have their origin in pre-trial showings where defense counsel was absent.

On the basis of its construction of what the state trial and appellate courts did, the Court of Appeals ruled that the merits of the factual dispute as to the independence of the in-court identifications were not resolved in the state court hearing.

The Court of Appeals found that there was an additional reason why Judge Ford should have held an evidentiary hearing. Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770, re-quires that if for any reason not attributable to the inexcusable neglect of petitioner evidence crucial to the adequate consideration of the constitutional claim was not developed at the state hearing, a federal hearing is compelled. The Court of Appeals thought "that the failure of the record to demonstrate in more detail the circumstances of the police station confrontation meets this test, as we think the relative suggestiveness of a challenged confrontation bears on whether a subsequent in-court identification has independent roots". [428 F. 2d p. 1353].

What has just been quoted was not an inadvertent statement. What the Court of Appeals, in effect, ruled is that no matter how satisfied a court is that a witness had adequate opportunity to observe the alleged criminal act, no matter what identification by picture prior to a showup has been made by the witness, if the defendant offers evidence that there has been a showup, the court *must* hear evidence with respect to the showup in order to determine not only whether it was permissible but whether it was so suggestive that the in-court identification no longer rests upon observations and identifications which previous to the showup would have been independent sources of the in-court identifications.

That I have not overstated the rule of the Court of Appeals is shown by its interpretation of the *Wade* case. The *Wade* case, in its central passage, (388 U.S. p. 241, 87 S.Ct. p. 1939) said this about the test of whether an in-court identification had an independent origin:

"We think it follows that the proper test to be applied in these situations is that quoted in Wong Sun v. United States, 371 U.S. 471, 488, [83 S.Ct. 407, 9 L.Ed.2d 441] ' "[W]hether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary

taint." Maguire, Evidence of Guilt 221 (1959).' See also Hoffa v. United States, 385 U.S. 293, 309, [87 S.Ct. 408, 17 L.Ed.2d 374]. Application of this test in the present context requires consideration of various factors; for example, the prior opportunity to observe the alleged criminal act, the existence of any discrepancy between any pre-lineup description and the defendant's actual description, any identification prior to lineup of another person, the identification by picture of the defendant prior to the lineup, failure to identify the defendant on a prior occasion, and the lapse of time between the alleged act and the lineup identification. It is also relevant to consider those facts which, despite the absence of counsel, are disclosed concerning the conduct of the lineup."

A casual reader of Mr. Justice Brennan's opinion might suppose that the "various factors" to which he referred merely were suggestive like the list of factors often set forth in restatements of the American Law Institute. But Mr. Justice Brennan said that when the independent origin of an in-court identification is subject to test "this test * * * *requires* consideration of various factors." [p. 241, 87 S.Ct. p. 1940]. The Court of Appeals interpreted that language as meaning that the listed factors "*must* be considered". [428 F.2d p. 1354].

This was by no means *obiter dictum*. Here Judge Ford from the record. had found, (as indeed, some would say Mr. Justice Kalus impliedly found at the trial and the Supreme Judicial Court found on appeal,) that at least Mr. Jacobson's identification rested not only upon "the prior opportunity to observe the alleged criminal act" but also upon "the identification by picture of the defendant prior to the lineup". Neither United States District Judge Ford nor the Massachusetts state court judges saw any need for a further exploration of additional factors. Yet the Court of

Appeals reversed Judge Ford for the following reason:

"It is apparent that the failure to develop the facts pertaining to this [March 20] viewing left the trial court unable to consider a factor we regard as crucial to any determination of *independence of recollection*: the suggestiveness of the tainted confrontation. Therefore, the failure of the district court to hold an evidentiary hearing was error." [428 F.2d p. 1354 (Emphasis added.)]

What the Court of Appeals stated is that the test is not whether there were adequate independent sources for the witness's in-court identification, but whether the witness's recollection at the time of the trial was independent of an impermissible showup. There is support for that test in the opinion of the Supreme Court in *Wade*. Mr. Justice Brennan said that, after there has been introduced evidence of an impermissible view, it is the duty of the prosecution "to establish by clear and convincing evidence that the in-court identifications were based upon observations of the suspect other than the lineup [or other unduly suggestive] identification." [388 U.S. at p. 240, 87 S.Ct. at p. 1939]. This test proceeds on the theory that if an impermissible showing has a strong impact, say because of its dramatic nature or because of its proximity to the trial, there is a *risk* that when the witness is testifying in court he will be relying on that recent dramatic experience and he will not be relying on his earlier observations, *adequate as they may have been*. The risk is so great that there must be an evidentiary hearing addressed to that risk and resulting in an explicit finding whether the original observations are still an independent source of the courtroom identification.

Admittedly this test invites an inquiry not only into objective facts but also a psychological inquiry into subjective areas which may strain the capacity of courts. Mr. Justice Black dissenting in United States v. Wade, 388 U.S. 218,

248, lines 10–20, 87 S.Ct. 1926, 1943, 18 L.Ed.2d 1149, said:

"How is a witness capable of probing the recesses of his mind to draw a sharp line between a courtroom identification due exclusively to an earlier lineup and a courtroom identification due to memory not based on the lineup? What kind of 'clear and convincing evidence' can the prosecution offer to prove upon what particular events memories resulting in an in-court identification rest? How long will trials be delayed while judges turn psychologists to probe the subconscious minds of witnesses? All these questions are posed but not answered by the Court's opinion."

In practice, lower federal courts have not excluded from their consideration a witness's testimony as to what he himself believes to be the sources of the memory on which he has relied or could rely for an in-courtroom identification, e. g. Clemons v. United States, 133 U.S. App.D.C. 27, 408 F.2d 1230, 1242, col. 1, first full paragraph (D.C. Cir.). But such testimony is generally regarded as requiring careful scrutiny. In the *Clemons* case just cited, Circuit Judge McGowan said that "although the positiveness of the witness about an independent base for an in-court identification is a relevant factor, it is to be weighed warily and on the realization that the most assertive witness is not invariably the most reliable one". Trial judges probably share Mr. Justice Black's scepticism about a witness's self-analysis of the sources of his belief. Their determinations are more likely to be based on whether they are persuaded beyond a reasonable doubt that the observations made by the witness before the impermissible confrontation were sufficiently clear, convincing, substantial, memorable, and consistently reported to be relied upon for a conviction. [*Ibid,* particularly 408 F.2d at pp. 1246 and 1250].

Having described at inordinate length the perplexing history of this case before it reached me, and having sought to extract from federal appellate court opinions the tests I am to apply, I now turn to making findings of fact and conclusions of law based on the evidence I took after remand of this case. These findings and conclusions are addressed to three issues: (1) was the March 20 police station showup or confrontation of Cooper by Mr. and Mrs. Jacobson impermissible on the ground that it was unduly suggestive in violation of the due process clause of the Fourteenth Amendment; (2) if so, was there an independent source of the in-court identifications by Mr. and Mrs. Jacobson which survived the impermissible March 20 showup, and (3) if not, was the admission of the in-courtroom identifications harmless or prejudicial error.

On the first issue, whether the March 20 showup at the police station was impermissible not merely because Cooper had no counsel but because they were unduly suggestive, these are the facts. On March 20, 1968 Mr. and Mrs. Jacobson separately viewed Cooper through a one-way mirror at the Cambridge police station. Cooper had not been charged with the crime of robbery of the Jacobson store, but was held on another accusation. He did not know he was going to be viewed. He had not been told that he was entitled to counsel at a view. When viewed Cooper had not shaved for 1 or 2 days, was without a coat, had an open collar without a tie, and wore slacks. In the room there were no persons not connected with the police. There were more than a dozen clean-shaven policemen, most of them in their shirtsleeves but none tieless. Some wore guns. None of them resembled Cooper or was unkempt. Some were over 30 years of age. In suggestiveness the situation can hardly be differentiated from a showup of Cooper alone. There was no emergency or other special circumstance that made it necessary for Cooper to be viewed alone or to be viewed immediately before a lineup could be arranged.

■ Upon those facts this court's conclusion of law is that Cooper's right

under the due process clause of the Fourteenth Amendment not to have a courtroom identification witness subjected to an impermissibly suggestive pretrial identification procedure was violated. Stovall v. Denno, 388 U.S. 293, 301–302, 87 S.Ct. 1967, 18 L.Ed.2d 1199. Furthermore, Cooper's right under the Fourteenth Amendment and the Sixth Amendment to have the assistance of counsel when he is being viewed while in custody, even though not indicted, was violated. Clemons v. United States, 133 U.S.App.D.C. 27, 408 F.2d 1230; Commonwealth v. Kazonis, 1970 Mass., A.S. 97, 255 N.E.2d 333; Commonwealth v. Guillory, 1970 Mass. A.S. 31, 254 N.E.2d 427.

The second issue is whether the courtroom identifications by Mr. and Mrs. Jacobson had an origin or source "independent" of the impermissible confrontations at the police station and which survived those confrontations.

Mr. and Mrs. Jacobson both saw two men (hereafter called A and B) enter their store as Mr. Jacobson was sweeping up at almost 10:25 p. m., or shortly before, on March 4, 1968. At all times the store was fully lit by sixteen double 8″ fluorescent lights that made it possible easily to read print as small as that in a telephone book. The men asked Mr. Jacobson for Robitussin A.C., a cough syrup. Not wishing to be interrupted, Mr. Jacobson, although he had the medicine, said he had none. The men then asked for another brand, and he told them to go down the aisle to his wife who was at a counter 20 feet away. In this first observation Mr. Jacobson was 3 feet from A for a fraction of a minute but he was not particularly attentive to him.

Instead of going directly to Mrs. Jacobson, A and B went to a card rack. Then A turned around, opened his coat, and revealed a Luger gun. B did likewise. They said "This is a holdup." A covered Mrs. Jacobson with his gun. He walked toward her until he was at a distance of less than 3 feet. His elbows were resting on the counter as he was pointing his gun at Mrs. Jacobson for about 2 or 3 minutes. B put his gun at Mr. Jacobson's back, and told him to fill up a paper bag with money from the two cash registers which were at the back of the store. Mr. Jacobson did this for a minute or two. At the same time, so far as he was able, he was watching Mrs. Jacobson and A at a distance of 20 feet. Mrs. Jacobson was telling him not to make trouble. She was concerned that he had a quick temper and a bad heart.

When the men had been in the store at most 4 or 5 minutes Mr. Jacobson told them that in 2 minutes the police would come to see that the store was closing. The men fled.

The police arrived a few minutes later. Mr. Jacobson gave them a description of A and B. He said that they were about 20–21; that A was taller than B, A being about 5 feet 9 inches tall; that A had blonde hair; that A talked with a "phony" Southern drawl; and that A had touched a particular package of cough syrup which the police took to see if it had fingerprints. All of those observations (as well as one about A's bloodshot eye which Mr. Jacobson says he did not report to the police) were noted by the police at 10:45 p. m. on March 4, 1968 and were typed shortly thereafter at the Cambridge police station on a "Complaint Report" introduced before me as Exhibit 1.

Mrs. Jacobson had no additional information to give the police. She testified both in the state trial court and in this court that her husband's powers of observation were better than hers.

March 5 the police invited Mr. Jacobson to the Cambridge police station to see if he could identify either of the robbers from photographs. The circumstances of this identification have already been accurately described by the Court of Appeals. After rejecting 5 or 6 boxes of photographs, Mr. Jacobson identified a photograph thrown in front of him as a photograph of robber A. The photograph was of Cooper, whom

the Cambridge police were going to arrest in Chicago on another charge.

On March 20 both Mr. and Mrs. Jacobson identified Cooper under circumstances earlier described in this opinion.

Cooper was on the night of the robbery 27 years old. He was about 5 feet 10 inches in height. He had dark not blonde hair. His most conspicuous features were pock marks, sunken cheeks, and a sallow complexion. I am persuaded that, despite their testimony before me, none of those features was mentioned by either Mr. or Mrs. Jacobson when the police asked for a description on the night of the robbery or at any time before March 20, 1968.

Nothing is shown in the record as to whether the police found any fingerprints on the package of cough syrup.

From the foregoing, it appears that Mr. Jacobson had a very limited opportunity to observe A carefully. When A first spoke to him at a 3-foot distance, Mr. Jacobson did not want to be interrupted in his sweeping, and there was no special reason why he should look at A. Later during the hold-up Mr. Jacobson was busy emptying the cash registers, and could not have spent time continuously looking at A. When he described A, he gave a color of hair different from Cooper's, he omitted Cooper's most conspicuous facial characteristics, and he gave A's age as 20 to 21, when Cooper was in fact 27. In court, two years after the robbery, and after being in prison, Cooper looked in his mid-thirties.

Mrs. Jacobson had 2 or 3 minutes for a close observation of Cooper. She was, however, naturally enough concentrating on her husband at a distance of 20 feet. He was not well and he was the victim who was handing over the money to the robbers. Mrs. Jacobson's recollection of the robbery a few minutes after it occurred was so weak that she did not correct her husband's description of the color of A's hair or of A's age, and she did not supply the police with any observa-

tions of her own such as the facial appearance of A.

This court cannot be unmindful that Mr. Justice Kalus, an able judge of the Superior Court, who heard the testimony of Mr. and Mrs. Jacobson impliedly found their observations of Cooper a sufficiently independent source to sustain their in-court identifications; that Mr. Jacobson's March 4 observations were such that, without being subjected to impermissible suggestions, he on March 5 identified a photograph of Cooper as a photograph of A; that an extraordinarily competent panel of the Supreme Judicial Court of Massachusetts expressing its judgment in an excellent opinion by Mr. Justice Kirk were "convinced beyond a reasonable doubt * * * that the Jacobsons' in-court identifications were based not on the confrontation at the police station [of which, as it has now turned out, they knew the essentials], but rather on observations of the accused at the time of the robbery" [p. 866, 248 N.E.2d p. 260]; and that Judge Ford, whose qualities are universally esteemed, held that the state court transcript "shows that there was clear and convincing evidence to support a finding that the Jacobsons' in-court identification was based on their observations at the time of the robbery, and not on the line-up identification". [p. 4 of his "Memorandum of Opinion", January 19, 1970 (unreported)].

Nonetheless, I am gravely troubled by the "Complaint Report" Exhibit 1, which records what Mr. Jacobson told the police 15 minutes after the robbery. So far as I can tell, none of the judges who earlier heard Cooper's case saw this exhibit although they had some less reliable information as to what the Jacobsons told the police on March 4, 1968.

The discrepancy between the March 4 description of Cooper and the actual appearance of Cooper is serious. The omission of reference to pock marks, hollow cheeks, and sallow complexion is significant.

■ Taking into account Mr. and Mrs. Jacobson's want of attention to robber A's appearance when he was in the store, their failure to note any features of robber A which would enable police to get a lead to Cooper if he had not already been photographed in connection with another crime, and Mr. Jacobson's unequivocal statements on March 4, the night of the robbery, that A had blonde hair and was 20–21, and that on the stand before me Mrs. Jacobson even spoke of A and B as "boys", I cannot conclude that the in-court identifications were clearly and convincingly shown to have a source independent of the unduly suggestive March 20 police station showup. cf. People v. Martin, 87 Cal.Rptr. 709, 471 P.2d 29 (Cal.Sup.Ct.) and People v. Caruso, 68 Cal.2d 183, 65 Cal.Rptr. 336, 436 P.2d 336.

The third issue is whether the admission of the in-court identifications was harmless or prejudicial error.

This is an issue quickly disposed of.

■ Without the in-court identifications the only evidence against Cooper would have been Mr. Jacobson's identification of the photograph of Cooper as the photograph of the robber A. [See Gilbert v. California, 388 U.S. 263, 272–273, note 3, 87 S.Ct. 1951, 18 L.Ed.2d 1178; Clemons v. United States, 133 U.S.App.D.C. 27, 408 F.2d 1230, 1242–1243]. So the error in admitting the courtroom identifications was plainly harmful.

It follows that this court must grant the prayer of the petitioner to be discharged from custody under the sentence imposed by Mr. Justice Kalus, subject, of course, to the risk of a second trial in the state court for the offense of armed robbery for which he has been indicted.

Perhaps in this case the *Wade* rule has a particular importance.

Even though Cooper had a fair trial in the state court before a judge of acknowledged integrity, professional skill, and judicial experience, and even though Cooper and the Commonwealth were competently represented by able counsel, the record in the state court has unfortunate gaps which perhaps can be cured on a second trial.

Cooper testified that he was registered at a Chicago hotel from February 20 to March 20, that he went to work for a named Chicago employer before March 4, and that he was not at work on March 4, but that he was at the employer's office at noon on March 5 to get an advance on his wages, and that at 8:00 p. m., on March 5, following a 2-hour bus ride, he was at work in a Chicago suburb—which would have been impossible if he had been in Cambridge at 10:30 p. m. on the previous night and if he could not pay for the air fare from Boston to Chicago.

Cooper did not produce the hotel register, the hotel clerk, the custodian of the financial and wage records of his employer, or the secretary who, he says, made the advance at noon on March 5. Cooper's lawyer in the Superior Court of the Commonwealth attributed the omissions to a lack of funds. Perhaps the omitted evidence can be secured for a second trial if in fact it corroborates Cooper and shows he has a valid alibi.

Without corroboration, Cooper was not believed by Mr. Justice Kalus presumably because his credibility was impeached when, on cross-examination, the prosecution drew from him the admission that he had been convicted of larceny on three previous occasions and of unarmed robbery on a fourth occasion.

Fortunately for Cooper, his poverty has not handicapped him in this court. Here he has been represented by counsel of unusual professional skill, diligence, and judgment supplied by the Community Legal Assistance Office in Cambridge to whom the court gladly acknowledges its debt.

Cooper is discharged from his custody under the sentence imposed by the Superior Court of the Commonwealth of Massachusetts for Middlesex County #80238 but not under any other sentence.