COMMONWEALTH vs. THOMAS M. TEMPESTA.

Suffolk. September 13, 1971. — February 15, 1972.

Present: TAURO, C. J., CUTTER, REARDON, BRAUCHER, & HENNESSEY, JJ.

*Identification. Evidence,* Fresh complaint.

Refusal in a rape case to suppress the victim's in-court identification of the defendant was proper, even though the victim had previously identified the defendant at an unduly suggestive police station viewing, where, on clear and positive testimony of the victim which was unshaken upon cross-examination, the in-court identification was found to be independent of the police station identification. [195]

At a trial for rape, testimony that the victim told her roommate of the alleged rape immediately after it occurred was properly admitted as a fresh complaint. [195]

INDICTMENT found and returned in the Superior Court on August 13, 1969.

The case was heard by *Forte, J.*

*Joseph J. Balliro* for the defendant.

*Garrett H. Byrne,* District Attorney, & *William A. Doherty,* Assistant District Attorney, for the Commonwealth.

CUTTER, J.   Tempesta was found guilty of rape by a Superior Court judge sitting without a jury.   The case is before us on Tempesta's bill of exceptions to rulings allowing an in-court identification by the victim, and to the admission of certain evidence.   Facts which the trial judge could have found on the evidence are summarized.[1]

---

[1] On motion of the Commonwealth we have examined the transcript of the proceedings in the Superior Court. The case was decided in the Superior Court on December 15, 1969, before our decisions in *Commonwealth* v. *Guillory,* 356 Mass. 591, and *Commonwealth* v. *Kazonis,* 356 Mass. 649. We felt it appropriate to have more complete findings by the judge of the facts pertinent to Tempesta's efforts to suppress evidence (a) of the victim's identification of Tempesta in a police station on July 22, 1969, and (b) her in-court identification of him on December 12, 1969. Accordingly, we remanded the case to the Superior Court for such findings. The judge received further evidence

The victim was walking down the stairs at the Science Park Station of the Massachusetts Bay Transportation Authority (M. B. T. A.) on Sunday, March 2, 1969, about 8:30 P.M. At a well lighted landing on the stairs, a white male pulled out a gun and ordered her to take off her clothes. She removed her parka. He pulled down her underclothes and had sexual intercourse with her. He was in her presence for a little less than ten minutes. She returned to her apartment, told her roommates she had been raped, and was taken to a hospital by the police for examination.

On July 22, 1969, Tempesta at the same M. B. T. A. station was arrested on a charge of indecent exposure, by an M. B. T. A. police officer. It was then stated to him that, at an earlier date, a girl had been raped in the station and that he fitted the description. He was taken to Police Station No. 1 (Station No. 1) and placed in a cell. The arresting officer had given him the so called *Miranda* case (see 384 U. S. 436) warnings and these were read to him again by Detective McDonough "when he first came to the station." Detective McDonough informed him "that he was going to be viewed and . . . that he had a right to an attorney at the viewing." He told him that "we were going to have a person come down and . . . look at him with regards to another incident and . . . that he had a right to counsel." Thereafter the victim viewed Tempesta, through a one-way window, in a room with several police officers, who could have been found to have been in civilian clothes, wearing white shirts. He had on a T-shirt. The victim recognized Tempesta. The judge (on a pre-trial hearing on a motion to suppress all evidence obtained by the identification process on July

on these aspects of the case on October 1, 1971. A transcript has been furnished to us. Thereafter we made a further remand of the case to the judge because of uncertainty whether his findings on the first remand dealt with all the factors discussed in *United States* v. *Wade,* 388 U. S. 218, 241, quoted in *Cooper* v. *Picard,* 316 F. Supp. 856, 859–860 (D. Mass.), and earlier in 428 F. 2d 1351, 1354 (1st Cir.). The judge, with meticulous care, has now amplified his findings in a manner which we regard as fully satisfying the *Cooper* case requirements.

22, 1969, and "any subsequent identification" thereby "tainted"), found that at Station No. 1 "before he was looked at by ... [the victim] he was notified [of his rights] again and knew what was going on" and that he voluntarily waived the right to have an attorney.[2]

At trial, the victim was subjected to lengthy cross-examination. Although she testified that she could not specify any particular special feature (nose, mouth, teeth) of her assailant that was not ordinary, she could still identify Tempesta. There was no "special facet" of his appearance that made her testify Tempesta was her assailant, but she said "I've never seen anybody that looked like him." She referred to a habit of Tempesta of holding "his head over to the side." When asked if he "cocked his head," she said, "Yes. . . . I notice that he still does. And he did that night."

Upon the first remand of the case for further findings concerning the identification (see fn. 1, *supra*), the judge (1) stated that he was "not convinced beyond a reasonable doubt that . . . [Tempesta] understood that he . . . [could] have an attorney present during the viewing" at Station No. 1 on July 22,[3] but (2) found that "the vic-

---

[2] Later, at trial, Tempesta testified that when he was arrested, the M. B. T. A. officer had said to him, "As long as you come straight and you haven't had anything to do with this other thing [the March 2 rape] don't worry about it [the July 22 indecent exposure charge] . . . . That's why I didn't want a lawyer. . . . I wouldn't want to wast[e] any money on a lawyer that I could spend on . . . [my] kids." As noted below, the judge on both remands (see fn. 1) has somewhat modified his conclusion concerning the police station identification on July 22.

[3] Our decisions in the *Guillory* case, 356 Mass. 591, 592–594, and in the *Kazonis* case, 356 Mass. 649, 651–653, dealt with circumstances in which in-court identification were held to be "the product of tainted pre-trial identification." See also *Cooper* v. *Picard*, 428 F. 2d 1351, 1353–1354 (1st Cir.); *S.C.* 316 F. Supp. 856 (D. Mass.). These decisions illustrate the great care which should be taken by police to ensure (a) that a suspect knows that he may have an attorney (provided at the Commonwealth's expense if the suspect is indigent) at a lineup or other similar pre-trial identification, and (b) that, particularly with respect to an unrepresented suspect, the circumstances of the lineup or other pre-trial identification are fair and free from suggestive aspects. Attention also should be given to a more recent decision of the United States Court of Appeals, *Allen* v. *Moore*, 453 F. 2d 970, 974 (1st Cir.), which further discusses police station identifications and the use of one-way mirrors.

tim's in-court identification of . . . [Tempesta] was in-
dependent of her identification and viewing of . . .
[Tempesta] on July 22 . . . and untainted and uninflu-
enced thereby." [4]

The further findings after the second remand differ
from those made earlier, chiefly in minor detail, and in
arrangement of the findings. They contain a detailed
description of (a) the events of March 2, 1969; (b) the
apprehension of Tempesta on July 22, 1969; and (c) the
identification at the police station, which the judge
decided to be "deficient in several regards." As on the
earlier remand, he "gave . . . [Tempesta] the benefit of
the doubt" and found that he did not knowingly waive
his right to have counsel present during the lineup. He
concluded that the identification was impermissible for
this reason and because the arrangement for the victim's
observation of Tempesta was such that the victim "was
aware that" he "was the man she was to view." The
judge, however, was of opinion that the police, at the
viewing, "had no conviction . . . whether Tempesta was
the man wanted." Although the judge found that the
viewing was "so structured as to be unduly suggestive,"
he concluded that it "was *not* so impermissibly suggestive
as to give rise to a substantial likelihood of irreparable
misidentification, given the firmness of [the] victim's im-
pression of her assailant on the day of the rape." He
further found that the victim's "observations of . . .
[Tempesta] during the March 2 rape were sufficiently
clear, convincing, substantial, and consistently reported
to be relied on for a conviction." [5] The judge reiterated

---

[4] He stated that he found "no ground for any reasonable doubt
regarding this conclusion" for various reasons, including (a) "the
victim's demeanor on the . . . stand," (b) her realization of the "serious
consequences" of a mistake on her part, (c) her desire not to convict
one who was innocent, (d) her positive testimony that she could have
identified Tempesta apart from the July 22 lineup, (e) her ample
opportunity to observe Tempesta prior to and during the rape, which
left "an indelible impression in her memory," and (f) her lack of any
confusion about the identification.

[5] The judge pointed out subsidiary facts which supported his con-
clusions: (a) the victim's "ample opportunity to observe" on March 2
for a substantial period of time; (b) the ample artificial lighting on

his conviction "beyond any reasonable doubt that the victim's in-court identification . . . is independent of the impermissible police lineup, and that the lineup was not sufficiently suggestive . . . to affect . . . her in-court identification."

1. These careful and precise findings (based on "clear and convincing" evidence [see *United States* v. *Wade*, 388 U. S. 218, 240] that the in-court identification was not dependent upon the identification at Station No. 1) are well warranted by the victim's clear and positive testimony, unshaken on cross-examination. In the light of the judge's findings, we perceive no occasion for suppressing the in-court identification. See *Commonwealth* v. *Robinson*, 355 Mass. 620, 622; *Commonwealth* v. *Bell*, 356 Mass. 724, 725; *Commonwealth* v. *Cefalo*, 357 Mass. 255, 257–258. See also *Commonwealth* v. *Preston*, 359 Mass. 368, 372–374.

2. The judge properly admitted testimony of the victim's "fresh complaint" to her roommate on the evening of the rape. See *Commonwealth* v. *Cleary*, 172 Mass. 175, 176–177; *Commonwealth* v. *Hanger*, 357 Mass. 464, 466; *Commonwealth* v. *Izzo*, 359 Mass. 39, 42–43. See also *Commonwealth* v. *Howard*, 355 Mass. 526, 529–530.

*Exceptions overruled.*

---

the M. B. T. A. station stairs; (c) the certainty of the victim's in-court identification; (d) the absence "of other conflicting identifications by the victim," and (e) "the lack of dramatic effect which the lineup had upon the victim — as evidenced by her probable inattention to the detail at the lineup." The judge in his findings referred to the careful police surveillance of the M. B. T. A. station in July, 1969, the admissions by Tempesta of previous presence there, and the inplausible explanation for his presence in the station where he had not been seen using the M. B. T. A. service at any time.