COMMONWEALTH vs. LEROY GORDON.

Middlesex.    March 13, 1978. — April 18, 1978.

Present: HALE, C.J., KEVILLE, & GRANT, JJ.

*Identification. Evidence,* Collateral matter.

Upon a review of the totality of the circumstances disclosed by the
record of a hearing on the defendant's motion to suppress photo-
graphic and in-court identifications of him by the victim of a rob-
bery at a gasoline filling station, this court concluded that the
identifications were reliable, even though the photograph of the
defendant was the only one in the array shown the victim which
depicted a man with braided hair as worn by the robber and even
though there was a discrepancy between the victim's description of
the height of the robber and the defendant's height. [234–240]
At a hearing on the defendant's motion to suppress photographic and
in-court identifications of him by the victim of a robbery at a gaso-
line filling station, the judge did not err in shutting off inquiries of
a police officer and of four youths, who had been in the station a few
hours before the robbery, as to whether the officer had shown
photographs to the youths and as to whether one of them had
picked out a photograph. [240–241]

INDICTMENT found and returned in the Superior Court
on November 9, 1976.

The case was tried before *Travers, J.*

*Jane Kenworthy Lewis* for the defendant.

*Michael J. McHugh,* Legal Assistant to the District
Attorney, for the Commonwealth.

GRANT, J. The defendant has been convicted of the
armed robbery of a gasoline filling station in Tewksbury
on September 18, 1976, and has appealed under the provi-
sions of G. L. c. 278, §§ 33A–33G. The errors which have
been assigned and argued are (1) the denial of the defend-
ant's motion to suppress (a) evidence of the photographic
identification of the defendant which the victim of the

robbery had made to the Tewksbury police two days following the robbery and (b) the victim's proposed in-court identification of the defendant as the robber, and (2) the exclusion of inquiries which counsel for the defendant sought to make of witnesses who testified at the pretrial hearing on the motion to suppress.

1. Our discussion of that motion will commence with a summary of the facts which could have been found on the relevant evidence which was adduced from all sources at the hearing on the motion.

The gasoline station in question was of the self-service type, with three slightly elevated pump islands and a rectangular cashier's booth located on the center island. There were windows in three sides of the booth, and one of those sides also contained a full length glass door. The victim of the robbery was the cashier, who either sat or stood inside the booth at all material times on the day of the robbery. At approximately 7:00 P.M. on that day, while there was still bright sunlight, a yellow Impala automobile containing three black men drove into the station. All three men emerged from the car. The driver, never identified, remained in the vicinity of the car; a second man, later identified by the cashier as one Williams, pumped gasoline into the car; and the third man, later identified by the cashier as the defendant, came to the window of the booth, which contained a cash slot at its bottom at approximately waist level. The third man paid for the gasoline which had been pumped into the car and conversed with the cashier for a period of from three to five minutes while he exchanged some small bills he had for ones of larger denominations which the cashier had. The cashier was seated on a stool inside the booth during the course of this incident, and the man in question was leaning over in the direction of the booth, as the conversation was conducted through the cash slot in the bottom of the window. The man was approximately two feet away from the cashier, who got a three-quarter side view of the man. The three men then got into their car and drove off.

At 10:00 P.M. the cashier extinguished all the lights in the station except those inside the booth and started to count his cash. The lights inside the booth illuminated the area outside the booth for a distance of approximately ten feet on the three sides of the booth which contained glass. A few minutes later the same yellow Impala drove into the station, and two black men emerged therefrom and walked in the direction of the booth. One man, whom the cashier recognized as the man who had pumped gasoline into the car at 7:00 P.M., stayed about ten feet from the booth. The other man, whom the cashier recognized as the man with whom he had conversed and exchanged bills at 7:00 P.M., walked up to the booth, produced a gun, threatened the cashier, entered the booth, took the money in the cash drawer, and left the booth. Both men then returned to the car, which was then driven off by a third person. When the robber reached the booth the cashier looked straight at him; he had the robber in his view for a little more than a minute during the course of the robbery; and at one point the robber actually brushed against the cashier.

The cashier, who will hereafter be referred to as the victim, telephoned the Tewksbury police, who arrived at the station within minutes after the robbery. The victim described the robber as a black man aged approximately twenty-three, weighing approximately 130 to 140 pounds, and wearing a partial moustache and tightly braided hair. He told the police that he could not give them an accurate description of the robber's height as he had not observed the robber standing up straight during the course of the robbery, but he estimated the robber's height as five feet two inches. On the night of the robbery the police showed the victim photographs from their files of two black males for the purpose of identifying the type of hairstyle which he had described. The victim immediately rejected both photographs as not showing the right kind of hair.

On the day following the robbery the victim saw a television news clip of persons who had been arrested following a robbery in Dedham and which portrayed one of the persons arrested as wearing his hair in rows of tight braids which ran from his forehead to the nape of his neck. The victim then called the police, described what he had seen, and advised them that the person who had robbed him had worn his hair in the same fashion.

The photographic identification which is challenged in this case took place on the afternoon of the second day following the robbery. The Tewksbury police showed the victim mugshots of nine different black males, displaying them in such fashion as to show only the heads and shoulders of the individuals portrayed. There was nothing suggestive about the manner in which the photographs were displayed, nor did the police ask any improper questions. The victim picked out two photographs, identifying one of them as a likeness of the person who had robbed him and the other as a likeness of the man who had remained outside the booth during the robbery. The victim did not hesitate in picking out either photograph. The first photograph, which was of the defendant, was the only one in the array which depicted a man wearing his hair in braids; it showed a man with a moustache wearing his hair arranged in rows of tight braids running from his forehead to the nape of his neck. The other photograph was of a man named Williams.

Both photographs had been obtained from the Lowell police, and both had been taken by the police in Bedford, New Hampshire. The information on the backs of the photographs disclosed that the defendant and Williams had been arrested together in Bedford two days prior to the robbery here in question and while in the company of a third black man by the name of Woodward, whose photograph had also been included in the array shown to the victim.[1] The information on the back of the photo-

---

[1] The entire array of photographs in unsanitized form was introduced in evidence at the hearing on the motion and is before us. The photographs were not offered in evidence at the trial.

graph of the defendant described him as twenty-three years old, weighing 140 pounds, and being five feet eleven inches tall. It does not appear that any of this information was ever disclosed to the victim at any time; indeed, it is not even referred to in the briefs of the parties.

The victim identified the defendant as the robber during the course of the hearing on the motion to suppress. The defendant was asked to rise, and the judge observed that he might be as tall as five feet eleven inches. The defendant produced four youths who had been present in the gasoline station at 7:00 P.M. on the day of the robbery and who identified the defendant as having been present at that time. All four testified that they had conversed with the defendant for several minutes at a point several feet away from the cashier's booth, described his hair as part Afro and only partially braided, and insisted that it was someone other than the defendant who had gone up to the booth on that occasion.

At the conclusion of the evidence, and following argument, the judge denied the motion in its entirety. Substantially the same evidence as has already been summarized was admitted at the trial.

The hearing on the motion was conducted by both counsel on the theory, and the judge appears to have considered, that the burden was on the defendant to prove that the photographic identification was unnecessarily suggestive and conducive to an irreparably mistaken identification and that the burden would be on the Commonwealth to prove by clear and convincing evidence that the proposed in-court identification would be independent of any taint in the photographic identification which the judge might find. See *Commonwealth* v. *Botelho,* 369 Mass. 860, 865–868 (1976); *Commonwealth* v. *Mobley,* 369 Mass. 892, 897 n.2 (1976); *Commonwealth* v. *Walker,* 370 Mass. 548, 565–566 n.12 (1976); *Commonwealth* v. *Cranshaw,* 4 Mass. App. Ct. 630, 632–633 (1976); *Commonwealth* v. *MacMillan,* 5 Mass. App. Ct. 314, 318 (1977). The judge found that "there was nothing imper-

missibly suggestive about the photographic procedures used"[2] and, accordingly, made no finding as to whether the proposed in-court identification would be independent of the photographic identification. See *Commonwealth* v. *Barnett,* 371 Mass. 87, 91 (1976), cert. denied, 429 U.S. 1049 (1977); *Commonwealth* v. *Chase,* 372 Mass. 736, 745–746 (1977); *Commonwealth* v. *Funderberg,* 374 Mass. 577, 582 (1978). The defendant complains of the finding just quoted, complains of the absence of any express finding that the in-court identification would be independent of the photographic identification, and points to the discrepancies in the evidence as to the robber's height, as to the defendant's hairstyle, and as to whether it was the defendant or one of the other occupants of the car who had gone up to the cashier's booth at 7:00 P.M. on the day of the robbery.

Some of the defendant's contentions might be troublesome in the absence of the case of *Manson* v. *Brathwaite,* 432 U.S. 98 (1977), which was decided subsequent to the *Botelho* case and subsequent to the rulings complained of in this case. It now appears that the bifurcated analysis and successive findings by the motion judge which are referred to and described in the *Botelho* case are no longer essential prerequisites to the admissibility of identification testimony which is challenged on due process grounds and that both an out-of-court identification (even one based on showing a witness a single photograph of the defendant) and an in-court identification may now be sustained if the appellate court, upon its own

---

[2] The judge, in the findings dictated by him at the conclusion of the argument of the motion, referred to the photographic identification as having occurred on the day following the robbery. It is clear from the transcript that the identification occurred on the afternoon of the second day following the robbery, and the parties have argued the case accordingly.

independent review of the totality of the circumstances disclosed by the record, concludes that the identifications were reliable. *Manson* v. *Brathwaite*, 432 U.S. at 109, 113–117. See *Commonwealth* v. *Nolin*, 373 Mass. 45, 51 (1977); *Commonwealth* v. *Farmer*, 5 Mass. App. Ct. 871, 872 (1977); *Commonwealth* v. *Fidler*, *ante* 28, 31, further appellate review granted, 374 Mass. 835 (1978). In the *Manson* case the Supreme Court said, "We . . . conclude that reliability is the linchpin in determining the admissibility of identification testimony for both pre- and post-*Stovall* [v. *Denno*, 388 U.S. 293 (1967)] confrontations. The factors to be considered are set out in [*Neil* v.] *Biggers*, 409 U.S. [188,] at 199–200 [1972]. These include [1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witness' degree of attention, [3] the accuracy of his prior description of the criminal, [4] the level of certainty demonstrated at the confrontation, and [5] the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself."[3] 432 U.S. at 114.

The first factor of reliability referred to in the *Manson* case presents no problem in the present case. The victim's opportunity to view the robber at the time of the crime was at least as good as, if not better than, the opportunity to view the criminal which the officer had in the *Manson* case. In addition, the victim had had an excellent opportunity to view the same individual in daylight conditions over a period of several minutes some three hours prior to the robbery. The victim testified that he had looked directly at the same individual on both occasions.

The next factor which must be considered is the witness's "degree of attention" to the criminal. Here we have a lay observer as opposed to the trained narcotics officer whose observations were under consideration in the *Man-*

---

[3] The numbers in brackets have been inserted for ease of reference in our opinion.

*son* case (432 U.S. at 115). It is quite clear that the Court's opinion in that case does not turn on the training or experience of the particular observer, but the opinion leaves unclear just what is comprehended within the concept "degree of attention." If we give the quoted words their ordinary meaning, we conclude that the victim in the present case was paying as much attention to the facial and other features of the robber as could reasonably be expected of the ordinary person who is confronted and threatened with a gun. The victim said he was looking "straight at" the robber when he was threatened and told to open the door of the booth, and we take note of the fact that within minutes of the robbery the victim was able to give an accurate description of the color, age, weight and tonsorial features of the person whose photograph he later selected.

The defendant points to the testimony of the four youths who were present in the station at 7:00 P.M., who gave a slightly different description of the defendant's hair, and who were unanimously of the belief that it was one of the other occupants of the car rather than the defendant who had gone up to the booth on that occasion. That testimony did not escape the judge, who remarked that "[t]he [victim] may very well be incorrect in saying that he spoke to the defendant on that occasion at the booth." The defendant's argument concerning the youths' testimony is misdirected. The question raised by a motion to suppress identification testimony is not whether the witness was or might be mistaken but whether any possible mistake was or would be the product of improper suggestions made by the police. *Commonwealth* v. *Wheeler*, 3 Mass. App. Ct. 387, 392 (1975). *Commonwealth* v. *Underwood*, 3 Mass. App. Ct. 522, 535 (1975). *Commonwealth* v. *Martin, post* 858 (1978). For the judge to exclude identification testimony solely for the reason that he believes a witness has made or might make a mistake would be tantamount to usurping the function of the jury.

The third factor which must be considered under the *Manson* case is the accuracy of the witness's prior description of the criminal. The defendant, ignoring all the other aspects of the victim's description, stresses the discrepancy (possibly as much as nine inches) between the estimate of the robber's height which the victim gave the police on the night of the robbery and the height of the defendant as shown on the back of his mugshot and observed by the judge at the hearing on the motion. But it must be remembered that the victim testified that he had been seated on a stool in the cashier's booth on a slightly elevated pump island at 7:00 P.M. and that the person with whom he had then conversed and exchanged bills was leaning over to talk through the cash slot, and that he had not observed the robber standing up straight during the course of the robbery. The discrepancy urged by the defendant did not pass the judge unnoticed. His findings include the following: [The] defendant was viewed at some of the time in question while he was outside of the booth and he was also viewed in the booth while he was going through various actions relating to obtaining the money so that the witness did not have an occasion to see him at any distance while he was standing erect; so that it is understandable that his judgment as to the height of the defendant could well have been inaccurate under the circumstances." We concur in the judge's analysis and conclusion, and attach no great weight to the single inaccuracy in the victim's description of the robber. Compare *Commonwealth* v. *Mobley*, 369 Mass. at 896 n.1.

The instant case presents no question as to either of the fourth and fifth factors delineated in the *Manson* case. The victim did not hesitate in picking out the photographs of the defendant and Williams. The photographic identification took place less than forty-eight hours after the robbery; the delay appears to have been occasioned in part by the paucity of photographs of blacks in the files of the Tewksbury police and the time required to obtain additional photographs from the Lowell police.

We come now to the question of the possible corrupting effect of showing the victim an array of photographs which included only one depiction of a person with braided hair such as the victim had described to the police on the night of the robbery and on the following day. We disapprove of any such array and are unimpressed by the Commonwealth's argument as to the practical difficulties involved in assembling an impartial array of photographs when a witness describes the criminal in terms of a distinctive physical characteristic or in terms of the particular clothing worn by him during the commission of the crime. See *Commonwealth* v. *Mobley*, 369 Mass. at 896. Our sole concern, however, is with what the record in this case discloses as to the effect which the suggestive photograph may have had on the victim's identification of the defendant as the robber, either at the time of the photographic identification or in court. On the defendant's side of the case, the record suggests nothing of any greater significance than the usual infirmities of any eyewitness identification and the possibility that such an identification might be improperly influenced by a single photograph. On the Commonwealth's side, the record discloses a witness who paid enough attention to facial and other physical characteristics that he felt confident in picking out not only the photograph of the defendant but also a photograph of the defendant's accomplice, who was depicted as a person of heavier build than the defendant and wearing his hair in a medium Afro.

Our review of the totality of the circumstances disclosed by the record of the hearing on the motion to suppress leads us to the conclusion that the factors of reliability outweighed the possible corrupting effect of the suggestive aspect of the photographic identification. "Surely, we cannot say that under all the circumstances of this case there is 'a very substantial likelihood of irreparable misidentification.' [*Simmons* v. *United States*, 390 U.S. 377, 384 (1968)]. Short of that point, such evidence is for the jury to weigh." *Manson* v. *Brathwaite*, 432

U.S. at 116. We hold that it was not error to deny either branch of the defendant's motion.

We would express a few words of caution, however. The *Manson* case permits an appellate court to reach its own independent judgment on the questions of reliability and the corrupting effect of a suggestive identification without the benefit of findings of fact made by the judge who hears and decides a motion to suppress.[4] We have pursued that course to a certain extent in the present case. The fact that we have done so is not to be regarded as a precedent for the future. Findings of fact by the motion judge on all the points which must be considered under the *Manson* case are highly desirable because they will often serve to obviate appeals and they will almost invariably serve to narrow the issues in cases which are appealed. In any case where we think it will be helpful to the proper resolution of any question, we shall not hesitate to call for findings or further findings. See *Commonwealth* v. *Tempesta*, 361 Mass. 191 (1972); *Commonwealth* v. *Mendes*, 361 Mass. 507, 511 n.4 (1972); *Commonwealth* v. *Martin*, 362 Mass. 243, 244 (1972).

2. At the hearing on the motion to suppress (but not at the trial) the judge shut off inquiries of a police officer and of the four youths who had been in the station at 7:00 P.M. as to whether the officer had shown one or more photographs to some or all of the youths and as to whether one of them had picked out a photograph. There had been no motion to suppress any testimony of any of the youths, all of whom were called as the defendant's witnesses. None of the questions put or desired was or would have been directed to the question whether the victim's photographic identification of the defendant had been elicited in a suggestive manner. See and contrast *Commonwealth* v. *Dickerson*, 372 Mass. 783, 787–789 (1977). It

---

[4] In that case the photographic and in-court identifications were both admitted in evidence at the trial without objection or exception. See *State* v. *Brathwaite*, 164 Conn. 617, 619 (1973).

· is clear from the transcript that the sole purpose of the inquiries was to elicit testimony from which the judge might infer that the victim's proposed in-court identification of the defendant would be unreliable simply because the four youths had given the police descriptions of the defendant which were more accurate than the one given by the victim. As we have already said, that type of factual question is to be resolved by the jury and not by the motion judge. See *Commonwealth* v. *Franklin,* 366 Mass. 284, 288–289 (1974). At best, the inquiries were directed to collateral matters and the judge could properly exclude them in the exercise of his discretion. See *Commonwealth* v. *Pettijohn,* 4 Mass. App. Ct. 829 (1976), *S.C.,* 373 Mass. 26, 30 (1977).

*Judgment affirmed.*