COMMONWEALTH vs. THOMAS J. CROWE
(and two companion cases[1]).

Middlesex.    September 10, 1985. — January 22, 1986.

Present: BROWN, KASS, & WARNER, JJ.

*Evidence*, Fruits of illegal arrest, Statement of codefendant, Verbal com-
pleteness, Fresh complaint, Relevancy and materiality, Identification.
*Identification. Practice, Criminal,* Nolle prosequi, Probable cause hear-
ing, Grand jury proceeding, Instructions to jury, Sentence, New trial.
*Rape. Joint Enterprise. Witness,* Committal on presumption of perjury.

The fact that at a hearing to suppress identification testimony in a rape case
    there was conflicting testimony as to whether the victim had given police
    a description of the defendant which included a beard and mustache did
    not make the judge's finding that such a description was given clearly
    erroneous. [461-462]
On a motion to suppress identification testimony in a rape case, the judge did
    not err in concluding that the victim's identification of the defendants
    at a lineup requested by a grand jury and ordered by a judge was not
    tainted by the defendants' prior illegal arrest and the victim's identifica-
    tion of photographs of the defendants taken after the arrest. [464]
It was apparent from the judge's findings in denying motions to suppress
    identification testimony in a rape case that the Commonwealth had met
    its burden of producing clear and convincing evidence that the victim's
    identification of the defendants at a lineup and at trial was based on the
    victim's observations of the defendants before and during the criminal
    incident and was untainted by suppressed photographic identifications
    or the viewing of the defendants' photographs in a newspaper. [464-466]
There was no merit to a criminal defendant's contention that a judge ruling
    on a motion to suppress identification testimony in a rape case erred in
    considering the victim's opportunity to observe the defendant in a club
    and on a bus prior to the incident in question and not merely at the time
    of the incident. [466]
Although in a twelve-man lineup that included the four defendants in a rape
    case none of the others resembled one of the defendants, the judge ruling
    on that defendant's motion to suppress the lineup identification did not
    err in concluding that, based on the totality of the circumstances, any

---

[1] The companion cases are against John R. Fournier and Corey W. Pirrotta.

suggestiveness in the lineup would not give rise to a substantial likelihood of irreparably mistaken identification. [466-468]

There was no merit to a criminal defendant's contention that the cumulative effect of the suggestiveness of pretrial identifications, the victim's view of a photograph of the defendant in a newspaper, and claimed weaknesses and inconsistencies in the victim's story required suppression of her in-court identification of the defendant. [469]

Action by the prosecutor, immediately prior to a scheduled District Court probable cause hearing and following the judge's denial of his request for a continuance, in entering a nolle prosequi on criminal complaints against four defendants did not constitute an abuse of prosecutorial power or a denial of the defendants' constitutional, statutory and common law rights to a speedy trial and a speedy probable cause hearing, where a grand jury was already investigating the matter, where the defendants were not the only subjects of that investigation, where the District Court did not have jurisdiction of the offenses charged, where the Commonwealth acted expeditiously, and where the defendants were not prejudiced by any resulting delay. [469-473]

At the trial of indictments charging aggravated rape, there was sufficient evidence as to the essential elements of the crime charged, including identification and lack of consent, to warrant denial of the defendants' motions for a required finding of not guilty. [473-477]

At the trial of a rape case, introduction in evidence of an out-of-court statement of a defendant who did not testify at trial did not violate a second defendant's right to confront witnesses, where the adverse effect of the statement on the second defendant, if any, was so indirect and incidental that the judge's instructions limiting the statement as evidence only against the first defendant were sufficient to protect the second defendant from possible prejudice. [477-478]

At the trial of a rape case, admission of an out-of-court statement made by the defendant with portions of the statement excluded did not, under the doctrine of verbal completeness, require admission of the excluded portions, where the excluded portions did not furnish an explanation or qualification of the part of the statement that was admitted in evidence. [478-479]

The judge at the trial of a rape case did not abuse his discretion in admitting in evidence, as fresh complaints, statements made by the victim to a woman officer at an army base some two hours after the rape, to a woman police officer a half hour later, and to a physician two hours after the second statement, even though in the period between the incident in question and the time she made the first complaint the victim had seen and conversed with five men, including a police officer and two military police officers, and had not reported a rape to any of them. [479-480]

At the trial of a rape case there was no error in the exclusion of testimony by a witness that shortly before the incident in question the defendant showed the witness a note, which the defendant said had been given to him by

the victim, nor in the exclusion of the witness's anticipated testimony as to the contents of the note. [480-481]

The record in a rape case did not support the defendants' contention that the judge's action in committing a witness pursuant to G. L. c. 268, § 4, on a presumption of perjury had the effect of inhibiting the defendants and their witnesses in presenting a defense. [481-482]

At the trial of four defendants charged with aggravated rape, the judge was not required to give the jury an instruction precisely as requested by one of the defendants, which the defendant asserted was necessary to prevent the jury from finding him guilty merely because he was present at the scene of the rape, where that danger was avoided by the judge's clear and comprehensive instructions on joint venture. [483]

There was no merit to a contention made by one of four defendants in a rape case that the judge's correct instructions on the effect of the victim's unconsciousness on the element of consent were prejudicial to him. [484-485]

At the trial of a rape case, the judge's instructions to the jury on the element of consent did not create a substantial likelihood of a miscarriage of justice. [485-486]

The record in a rape case did not support the defendant's contention that the judge had relied exclusively on "political considerations" when he imposed sentence. [486]

The judge in a rape case did not err in denying the defendants' motion for a new trial without a hearing, where the motion was based on a defendant's unsupported allegations that a codefendant who had been acquitted would testify at a hearing that it was he and not one of the convicted defendants who had raped the victim. [486-487]

INDICTMENTS found and returned in the Superior Court Department on May 16, 1983.

Motions to dismiss and to suppress evidence were heard by *Elizabeth A. Porada,* J.

The cases were tried before *Robert A. Barton,* J., and motions for a new trial were considered by him.

*Brownlow M. Speer,* Committee for Public Counsel Services, for Thomas J. Crowe.

*Judith Farris Bowman* for Corey W. Pirrotta.

*John A. McNiff (James F. McNiff, II,* with him) for John R. Fournier.

*Joseph P. Musacchio,* Assistant District Attorney, for the Commonwealth.

WARNER, J. After a jury trial in the Superior Court, the defendants were convicted of aggravated rape.[2] Their motions for a new trial were denied. Their appeals raise common and discrete issues.[3] We recite the facts relevant to each issue separately. .

1. *The motions to suppress.* On various grounds, the defendants challenge the denials of their motions to suppress the victim's identifications of the defendants at a lineup and at trial.

"We begin our review with the well-settled proposition that the judge's findings of fact are 'binding in the absence of clear error . . . and [we] view with particular respect the conclusions of law which are based on them.' *Commonwealth* v. *Correia,* 381 Mass. 65, 76 (1980). While the judge's ultimate findings of fact and rulings of law, as they bear on issues of constitutional dimension, are open for reexamination by this court, such ultimate findings are 'entitled to substantial deference by this court.' *Commonwealth* v. *Bookman,* 386 Mass. 657, 661 n.6 (1982). Questions of credibility are, of course, for the . . . judge to resolve. *Commonwealth* v. *Meehan,* 377 Mass. 552, 557 (1979)." *Commonwealth* v. *Bottari,* 395 Mass. 777, 780 (1985).

We summarize the judge's findings of fact (only one of which, as will be seen below, is disputed), supplemented by uncontradicted evidence not involving determinations of credibility.[4] On April 22, 1983, the victim and a friend went to the

---

[2] The defendants were also tried on indictments charging kidnapping and indecent assault and battery. At the close of all of the evidence, the judge allowed the defendants' motions for required findings of not guilty on the kidnapping indictments. The defendants were found guilty of indecent assault and battery, but those indictments were placed on file with the defendants' consent. Thus, there is no issue before us with respect to those convictions. *Commonwealth* v. *Tavares,* 385 Mass. 140, 141 n.1, cert. denied, 457 U.S. 1137 (1982). A fourth defendant, Glenn Little, was acquitted on all charges.

[3] The defendants Crowe and Pirrotta have, in addition to the arguments set forth in their briefs, adopted by reference the arguments made by other defendants in support of reversal of their convictions. Mass.R.A.P. 16 (j), 365 Mass. 863 (1974).

[4] Unfortunately, some of the judge's material findings are couched in recitations of the victim's testimony. However, it is clear in context that

Franklin Club in Shirley, Massachusetts, where, at about 9:00 P.M., they sat at a table near a stage on which a band named "Grand Slamm" was performing. The four-member band played from about 9:00 P.M. to 12:45 A.M., and there were at least three intermissions. While the band performed, the victim either sat at the table and talked with her companion and others or danced; there were dim overhead lights in the club and other lights which focused on the band. During one of the intermissions the victim spoke with the drummer and the defendant Pirrotta, who was also a member of the band. From about 8:30 P.M. to 12:45 A.M., the victim had at least four beers at the club. After the conclusion of the performance, Pirrotta offered the victim a ride to Fort Devens, where the victim, a private in the United States Army, resided. At that time, under good lighting conditions, she conversed with Pirrotta and other members of the band and their crew for approximately fifteen minutes. The defendants Crowe and Fournier were present during this time, and the victim had also observed them during the evening near the stage and at the bar.

Thereafter, the victim left the club and boarded the band's bus, along with seven or eight other people, including the defendants. The victim sat next to Pirrotta in the second seat in the front of the bus; Crowe sat behind and Fournier in front of her. The bus remained in the parking lot for ten to fifteen minutes; during that time the overhead lights in the bus were on. As the bus left the parking lot, the overhead lights were turned off, but the dashboard lights were on. During the ensuing trip light shone in from street lights from time to time.

The victim's version of the incident on the bus relevant to these appeals, as recited by the judge, was as follows. After the bus began moving, Crowe and Fournier put their hands on the victim's shoulders and forced her to move to the middle of the seat and lie down; Fournier unhooked her bra. Pirrotta, who had earlier left the seat, reappeared, pulled down her pants, and forced his penis into her vagina. Subsequently, the victim's clothes were put on, and she was carried off the bus

the judge credited the victim's testimony in those respects and adopted it as her findings.

and left in a field at the side of the road. On that same morning, after voluntarily appearing at the police station, the defendants were arrested. After the arrests, they were photographed for purposes of a photographic array. Shortly thereafter, the victim was shown eight photographs, including those of the defendants. The victim selected the photographs of the defendants.

On April 26, 1983, the victim viewed a second photographic array. The defendants' pictures were not included, and the victim did not identify anyone. Two days later, the victim saw, for approximately thirty seconds, a newspaper photograph which showed the defendants at their arraignments.

On May 11, 1983, the victim participated in a lineup identification, conducted to aid a grand jury investigation. Twelve people were in the lineup, including the defendants. The victim was asked to identify anyone who had been on the bus and to describe that person's role in the rape. She selected Pirrotta as a person who had intercourse with her. She identified Crowe and Fournier as the men who held her down. All of the defendants were represented by counsel who were present during the lineup.

Prior to trial, the defendants moved to suppress the photographic identifications, the lineup identifications and any subsequent in-court identifications. The motion was granted only as regards the photographic identifications on the ground that they were the product of an illegal detention resulting from an illegal arrest of the defendants.[5] On appeal, the defendants challenge the denials of their motions to suppress the victim's lineup and in-court identifications.

(a) The victim testified that on the morning of the incident she gave the police a description of Pirrotta which included a beard and mustache. Pirrotta argues that the judge's finding to that effect is clearly erroneous, as there was contrary testimony from the police officer to whom the description was

---

[5] The judge ruled, correctly we think, that the arrest lacked probable cause. The Commonwealth does not question that ruling. The defendants were arrested for kidnapping. See G. L. c. 265, § 26. The judge found that the facts and circumstances within the knowledge of the police at the time of the arrest were insufficient to warrant a prudent man in believing that the defendants had kidnapped the victim. See *Commonwealth* v. *Howell*, 394 Mass. 654, 658 (1985).

given. The argument ignores the role of the fact finder. "Where there has been conflicting testimony as to a particular event . . . a judge's resolution of such conflicting testimony invariably will be accepted. *Commonwealth* v. *Jones,* [375 Mass. 349, 354 (1978)]. 'The determination of the weight and credibility of the testimony is the function and responsibility of the judge who saw and heard the witnesses and not of [an appellate] court.' *Commonwealth* v. *Moon,* [380 Mass. 751, 756 (1980)]." *Commonwealth* v. *Spagnolo,* 17 Mass. App. Ct. 516, 517-518 (1984). There was no error.

(b) In her rulings on the identifications, the judge first addressed the question of in-court identifications. Applying the holding of *United States* v. *Crews,* 445 U.S. 463 (1980), she concluded that any such identification would be supported by an independent source — the victim's observations of her assailants before and during the incident — not related to the illegal arrest or tainted by the suppressed photographic identifications. Next, the judge, for the same reason, concluded that the lineup identifications would not be suppressed.

(i) Crowe, conceding that *Crews* supplies the proper analysis for the determination of the admissibility of in-court identifications in the circumstances, argues that the judge erred in applying *Crews* rather than *Brown* v. *Illinois,* 422 U.S. 590 (1975), on the question of the admissibility of the lineup identifications. Both *Crews* and *Brown* are among the progeny of *Wong Sun* v. *United States,* 371 U.S. 471 (1963), which "articulated the guiding principle for determining whether evidence derivatively obtained from a violation of the Fourth Amendment is admissible against the accused at trial." *Crews, supra* at 470.[6]

*Brown,* like *Wong Sun,* involved the question of the admissibility of inculpatory statements of a defendant following an

---

[6] "We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' Maguire, Evidence of Guilt, 221 (1959)." *Wong Sun, supra* at 487-488.

illegal arrest. The issue presented in *Brown* was whether *Miranda*[7] warnings, in themselves, make such a statement "sufficiently a product of free will to break, for Fourth Amendment purposes, the causal connection between the illegality and the confession." 422 U.S. at 603. In holding that such was not the case, the Supreme Court said: "The *Miranda* warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct are all relevant." (Citations and footnotes omitted.) *Id.* at 603-604. The holding, the Court said, was limited: "We decide only that the Illinois courts were in error in assuming that the *Miranda* warnings, by themselves, under *Wong Sun* always purge the taint of an illegal arrest." *Id.* at 605.

In *Crews,* the Supreme Court dealt with the question of an in-court identification of a defendant which had been preceded by an illegal arrest and consequent photographic and lineup identifications. The pretrial identifications flowed directly from the illegal arrest, 445 U.S. at 469 n.10, and were "conceded to be suppressible fruits of the Fourth Amendment violation." *Id.* at 472. The Court compared the "typical" case with an in-court identification case. "As . . . cases [subsequent to *Wong Sun*] have confirmed, the exclusionary sanction applies to any 'fruits' of a constitutional violation — whether such evidence be tangible, physical material *actually seized in an illegal search,* items observed or words overheard *in the course of the unlawful activity,* or confessions or statements of the accused obtained *during an illegal arrest and detention. . . .* E.g. *Dunaway* v. *New York,* 442 U.S. 200 (1979); *Brown* v. *Illinois,* 422 U.S. 590 (1975)" (emphasis supplied and some footnotes omitted). 445 U.S. at 470 & n.14.

"In the typical 'fruit of the poisonous tree' case, however, the challenged evidence was acquired by the police *after* some

---

[7] *Miranda* v. *Arizona,* 384 U.S. 436 (1966).

initial Fourth Amendment violation, and the question before the court is whether the chain of causation proceeding from the unlawful conduct has become so attenuated or has been interrupted by some intervening circumstance so as to remove the 'taint' imposed upon that evidence by the original illegality. Thus most cases begin with the premise that the challenged evidence is in some sense the product of illegal governmental activity" (emphasis in original). *Id.* at 471.[8]

In contrast, the Court noted that a victim's in-court identification has three distinct elements. "First, the victim is present at trial to testify as to what transpired between her and the offender, and to identify the defendant as the culprit. Second, the victim possesses knowledge of and the ability to reconstruct the prior criminal occurrence and to identify the defendant from her observations of him at the time of the crime. [Independent recollection.] And third, the defendant is also physically present in the courtroom, so that the victim can observe him and compare his appearance to that of the offender." *Id.*

Here, the judge focused on the second element of an in-court identification as set forth in *Crews.* (No argument is made, nor could it be in light of *Crews,* 445 U.S. at 471-472, 475, that either the victim's or Crowe's presence in court was the product of the illegal arrest.) She concluded, after considering conventional factors, see *Crews,* 445 U.S. at 473 n.18, that any in-court identification of the defendants by the victim would have an independent origin antedating the arrest and would not be tainted by the suppressed photographic identifications. Turning to the lineup identification, the judge concluded that it was not the product of the illegal arrest, as the lineup was requested by a grand jury and ordered by a judge of the Superior Court following the nolle prosequi in a District Court of the charges stemming from the arrest. See *Johnson* v. *Louisiana,* 406 U.S. 356, 365 (1972). Thus, *Brown* v. *Illinois* had no application.[9] See *Commonwealth* v. *Hine,* 393 Mass. 564, 569-

---

[8] See, for recent "typical" Massachusetts cases, *Commonwealth* v. *Sylvia,* 380 Mass. 180, 183-185 (1980); *Commonwealth* v. *Bradshaw,* 385 Mass. 244, 258 (1982); *Commonwealth* v. *Borges,* 395 Mass. 788, 795-797 (1985).

[9] Contrast *Commonwealth* v. *Pietrass,* 392 Mass. 892 (1984), where the remand order directed the judge to consider the *Brown* factors in relation to a

570 (1984). The judge then ruled that the lineup identification had an independent origin, untainted by the photographic identification (or by the victim's view of the defendants' pictures in the newspaper), and should not be suppressed. The judge properly considered the integrity of the lineup identifications without regard to the illegal arrest as a causal factor. Again, the judge did nothing more than apply the well-established independent origins test. See *United States* v. *Wade,* 388 U.S. 218, 241 (1967); *Crews, supra* at 473 nn.18 & 19; note 13, *infra.*

(ii) Fournier contends for two reasons that both the lineup and the in-court identifications should have been suppressed. First, he says that the judge failed to apply the correct evidentiary standard. In the circumstances, the burden was on the Commonwealth to prove by clear and convincing evidence that the identifications were and would be based on an independent source. *United States* v. *Wade,* 388 U.S. 218, 240 (1967). *Commonwealth* v. *Venios,* 378 Mass. 24, 30 (1979). The judge explicitly found that the identifications were and would be based on the victim's observations of the defendants before and during the incident, untainted by the suppressed photo-

---

lineup conducted while the defendant was under unlawful arrest. The lineup in *Crews,* as the judge in this case expressly recognized, was the direct product of an illegal arrest. Contrast also *Commonwealth* v. *Fredette,* 396 Mass. 455, 460 (1985), where the court found it unnecessary to consider the independent source test because the evidence sought to be suppressed was so attenuated as to dissipate the taint of an illegal arrest. In that case the evidence (fingerprints) was obtained after the illegal arrest. In *Ferguson* v. *State,* 301 Md. 542, 549-552 (1984), the Maryland Court of Appeals applied the *Brown* factors to a showup conducted in the defendant's holding cell twenty minutes after his illegal arrest. Even if we were to apply the *Brown* factors to the lineup identification in this case (the judge did consider the first two factors), we would conclude that the identification was not obtained by exploitation of the illegal arrest. First, the lineup was conducted eighteen days after the arrest and two days after the charges resulting from that arrest had been nol prossed in a District Court. Second, the lineup was conducted at the request of and in the course of an investigation by an independent grand jury; and it was ordered, after hearing, by a Superior Court judge. See *Johnson* v. *Louisiana, supra.* Third, we do not view the police activity here as purposefully illegal or flagrant to the extent that it might require suppression. See *Commonwealth* v. *Fredette, supra* at 462-463.

graphic identifications or the viewing of the defendants' pictures in the newspaper. Implicit in the judge's findings is the conclusion that the Commonwealth had met its burden of producing clear and convincing evidence of independent source. See *Commonwealth* v. *Venios, supra*; *Commonwealth* v. *Correia,* 381 Mass. 65, 78 (1980).

Next, Fournier argues that the judge failed properly to apply the independent origins branch of the *Crews* test. This is so, he says, because the judge improperly took into account the victim's opportunity to observe the defendants in the club and on the bus prior to the incident and not merely at the time of the incident. Interrelated with this argument is the contention that the judge's subsidiary findings do not support her conclusions as to independent source. Fournier's position would have us leave common sense behind. A victim's knowledge of and opportunity to observe the defendants prior to the incident are relevant to a determination of whether a subsequent identification has an independent source. See *United States* v. *Wade,* 388 U.S. 218, 241 n.33 (1967); *Commonwealth* v. *Ferguson,* 365 Mass. 1, 7 (1974); *Moore* v. *People,* 577 F.2d 411, 414 & n.8, 416-417 (7th Cir. 1978), cert. denied sub nom., *Moore* v. *Illinois,* 440 U.S. 919 (1979). Cf. *Commonwealth* v. *Gordon,* 6 Mass. App. Ct. 230, 231-232, 236 (1978). In the exercise of our independent judgment, we conclude, giving substantial deference to the ultimate finding, that the judge's subsidiary findings amply support her determination of independent source. See *Commonwealth* v. *Bookman,* 386 Mass. 657, 661 n.6 (1982).

(iii) What we have said in part 1(b)(i) above disposes of Pirrotta's argument that the lineup identifications were direct products of the illegal arrest. Pirrotta also argues that the lineup identification of him should have been suppressed because it was unnecessarily suggestive.[10]

---

[10] In a footnote in his principal brief Pirrotta also challenges the lineup as violative of his Sixth Amendment right to counsel because, although counsel was present, he had no say in the makeup of the lineup. As with other glancing allegations similarly raised, the contention does not rise to the level of appellate argument. See Mass.R.A.P. 16(a)(4), as amended, 367

The judge found that none of the others in the twelve-man lineup resembled Pirrotta, who was tall and had blond hair and a mustache and beard. All four defendants (see note 2, *supra*) were in the lineup, which also included four people employed in the courthouse where it was held. As to the latter participants, the judge noted, without elaboration, that they "could have been known" to the victim. The judge concluded, based on the totality of the circumstances, that the lineup was not so unnecessarily suggestive as to give rise to a substantial likelihood of irreparably mistaken identification. See *Simmons* v. *United States,* 390 U.S. 377, 384 (1968); *Neil* v. *Biggers,* 409 U.S. 188, 197 (1972); *Commonwealth* v. *Moynihan,* 376 Mass. 468, 475 (1978); *Commonwealth* v. *Paszko,* 391 Mass. 164, 170 (1984); *Commonwealth* v. *Hicks,* 17 Mass. App. Ct. 574, 583 (1984).

It is clear from the judge's findings and conclusions that in determining the admissibility of the lineup identification she engaged in the balancing process required by *Neil* v. *Biggers, supra* at 199-200, and *Manson* v. *Brathwaite,* 432 U.S. 98 (1977). "Under the *Biggers* and *Manson* cases, 'reliability is the linchpin in determining the admissibility of identification testimony.' " *Commonwealth* v. *Hicks, supra* at 577, quoting from *Manson* v. *Brathwaite, supra* at 114. "At the present time the Commonwealth is entitled to put in evidence otherwise admissible identifications that, despite improper suggestiveness, satisfy the reliability test." *Commonwealth* v. *Hicks, supra* at 577-578.[11]

---

Mass. 921 (1975). In any event, the defendant has no *right* to anything beyond the presence of counsel at a lineup. See *United States* v. *Wade,* 388 U.S. 218, 236-239 (1967); *United States* v. *Ash,* 413 U.S. 300, 324 (1973) (Stewart, J., concurring).

[11] "The Supreme Judicial Court has not adopted any more restrictive local rule (see, most recently, *Commonwealth* v. *Paszko,* 391 Mass. 164, 172 n.9 [1984]), and has on several occasions taken note of, and acquiesced in, this court's application of the reliability analysis of the *Biggers* and *Brathwaite* cases." *Commonwealth* v. *Hicks, supra* at 577. See also cases cited & n.2 at 577.

The judge made findings on each of the factors prescribed in *Biggers* and *Brathwaite*.[12] She found that (1) the victim had an adequate opportunity to view the defendants at the time of the incident,[13] (2) the victim's attention was fixed on the defendants during the incident, (3) the description the victim said she gave to the police on the day of the incident did not vary in any material way from the actual appearances of the defendants, (4) the victim did not demonstrate any uncertainty in her identifications of the defendants, and (5) a short period of time (eighteen days) had elapsed between the incident and the lineup. The victim identified all four defendants (see note 2, *supra*); she had never failed to identify them. Implicit in the judge's findings is the conclusion that any suggestive aspects of the lineup identification were outweighed by the reliability factors. We agree. "Surely, we cannot say that under all the circumstances of this case there is 'a very substantial likelihood of irreparable misidentification.' [*Simmons* v. *United States*, 390 U.S. 377, 384 (1968)]. Short of that point, such evidence is for the jury to weigh." *Manson* v. *Brathwaite, supra* at 116.

---

[12] "The factors to be considered are . . . [1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witness' degree of attention, [3] the accuracy of his prior description of the criminal, [4] the level of certainty demonstrated at the confrontation, and [5] the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself." *Manson* v. *Brathwaite, supra* at 114.

[13] Strengthening the finding in this respect were the judge's findings with respect to the victim's opportunity to observe the defendants in the club and on the bus prior to the incident. See *Commonwealth* v. *Gordon,* 6 Mass. App. Ct. 230, 231-232, 236 (1978). See also the discussion in part 1(b)(ii), *supra.* The independent source and the reliability tests are essentially the same. "The crucial determination in both instances is whether the identification sought to be admitted in evidence is the product of the witness' observations at the time of the crime or is instead the product of improper suggestions by the police." *Commonwealth* v. *Wheeler,* 3 Mass. App. Ct. 387, 392 (1975).

Also, the victim was able to view her assailants at close range during the incident, and she gave the police descriptions of the defendants' hair colors, lengths and textures and their physiques. While the bus may have been dark during part or all of the incident, the victim's eyes were presumably accustomed to whatever lighting conditions existed. See *Commonwealth* v. *Hicks, supra* at 579.

*Commonwealth* v. *Gordon,* 6 Mass. App. Ct. at 239-240. See *Commonwealth* v. *Jones,* 375 Mass. 349, 355 (1978); *Commonwealth* v. *Dietrich,* 381 Mass. 458, 464 (1980).

What we have said with respect to the lineup identifications disposes of Pirrotta's argument that the in-court identifications should have been suppressed because of the suggestiveness of the lineup. See *Commonwealth* v. *Hicks, supra* at 577.

There is no merit in Pirrotta's remaining argument, that the cumulative effect of the suggestiveness of pretrial identifications and the view of the newspaper photograph and the claimed weaknesses and inconsistencies in the victim's story should have led to the suppression of her in-court identification of him. "The question raised by a motion to suppress identification testimony is not whether the witness was or might be mistaken but whether any possible mistake was or would be the product of improper suggestions made by the police [citations omitted]. For the judge to exclude identification testimony solely for the reason that he believes a witness has made or might make a mistake would be tantamount to usurping the function of the jury." *Commonwealth* v. *Gordon, supra* at 237. See *Commonwealth* v. *Paszko,* 391 Mass. at 172.

2. *The motions to dismiss the indictments.* Fournier and Pirrotta argue that the Superior Court judge erred in denying their motions to dismiss the indictments for aggravated rape which were returned by the grand jury after the prosecutor had nol prossed complaints on the same charge against the defendants in a District Court. The defendants contend that the prosecutor's action in nol prossing the complaints constituted an abuse of prosecutorial power and a denial of their constitutional, statutory and common law rights to a speedy hearing.

We summarize the uncontroverted facts found by the judge. After their arrests on April 23, 1983, the defendants were arraigned in a District Court on April 27, 1983, on complaints for aggravated rape. At that time, the prosecutor informed the court that he intended to proceed with a probable cause hearing but that he might later decide to present the matter to a grand jury. Pirrotta's counsel stressed his preference for a probable cause hearing so that he might cross-examine witnesses and

obtain discovery. The defendants objected to the prosecutor's motion for an in-court lineup on the grounds that there had been suggestive photographic identifications and no earlier lineup and that the defendants' counsel needed more time to prepare for such a lineup. The motion was denied without prejudice to its renewal at the probable cause hearing.

The cases were scheduled for a probable cause hearing on May 9, 1983, and all parties appeared on that date. The prosecutor had his witnesses available and represented to the court that he was ready to proceed. However, he asked for a continuance to May 23, 1983, for the following reasons: (1) on May 2, a grand jury had begun an investigation into the matter and had heard testimony on that date and on May 4; (2) as a result of what occurred on May 4, further motions and other matters (involving the conduct of a lineup at the request of the grand jury) had to be resolved before the grand jury completed its work; (3) the defendants were not the only ones who were the subjects of the grand jury's attention; (4) the District Court did not have jurisdiction to try the defendants on the crime charged; (5) a grand jury would ultimately have to resolve the issue of probable cause; (6) the Commonwealth was acting in good faith to secure a speedy determination by the grand jury; and (7) the Commonwealth wished to hold the defendants under bail until the grand jury acted. The District Court judge denied the continuance, and the prosecutor then, over the defendants' objections, nol prossed the complaints, assigning as his reason (see Mass.R.Crim.P. 16[a], 378 Mass. 885 [1979]), the ongoing grand jury investigation.

As mentioned, at the lineup on May 11, 1983, ordered at the request of the grand jury by a Superior Court judge, the victim identified the defendants. The grand jury were shown a video tape of this lineup and were given the results of the victim's identifications. On May 13, 1983, the grand jury, after hearing further evidence, voted to return the indictments; they were returned on May 16, 1983.

The Superior Court judge concluded that, in view of the grand jury investigation, the fact that the defendants were not the only subjects of that investigation, the lack of jurisdiction in

the District Court and the pendency of proceedings in the Superior Court (petitions for orders for lineups), the prosecutor did not improperly nol pros the District Court complaints. The judge also determined that there was no denial of the defendants' rights to a speedy hearing — "The grand jury began its investigation on May 2, 1983. Indictments were returned on May 16, 1983, and the defendants were arraigned on May 18, 1983. The Commonwealth could not have acted more expeditiously."

The defendants' reliance on *Commonwealth* v. *Thomas,* 353 Mass. 429 (1967), and like cases in support of their claim that there was an abuse of prosecutorial power is misplaced. What was said in *Commonwealth* v. *Hinterleitner,* 391 Mass. 679 (1984), decided after the decision on the motion in this case, is apt and dispositive.

> "There is a significant difference between *Commonwealth* v. *Thomas, supra,* and the present situation. In both matters the prosecutors used their nol pros power, *Commonwealth* v. *Brandano,* 359 Mass. 332, 335 (1971), *Attorney Gen.* v. *Tufts,* 239 Mass. 458, 489, 537-538 (1921), and in both matters the prosecutors thereafter proceeded by indictment, which ordinarily is not barred by the nol pros of a complaint. *Commonwealth* v. *Jones,* 9 Mass. App. Ct. 103, 112 (1980), aff'd in part, and rev'd in part, *S.C.* 382 Mass. 387 (1981). Contrast *Commonwealth* v. *Benton,* 356 Mass. 447, 449 (1969). However, in *Thomas,* the prosecutor misused his power, first, by threatening to exercise it in order to force the judge to grant a continuance to which the Commonwealth was not entitled, and then, by carrying out that threat. The prosecutor's power was not used for a legitimate purpose. In contrast, there was no threat here. There was no attempt by the assistant district attorney to use the power of his office to force the judge to grant a continuance. For all that appears, the decision to proceed by indictment was a proper exercise of the prosecutor's discretion and was made independently of any desire to intrude on the prerog-

atives of the judge. For all that appears, the decision to nol pros was a natural consequence of that decision. Furthermore, we do not interpret the judge's order to proceed with the probable cause hearing as having been intended to preclude an exercise of the nol pros power. Such an order would have been inappropriate. See *Commonwealth* v. *Dascalakis,* 246 Mass. 12, 18-19 (1923). The reasoning of the judge appears only to have been that if the complaints were to remain alive the probable cause hearing would have to proceed as scheduled. The conduct of the assistant district attorney, therefore, was not an affront to the court, as it was in *Commonwealth* v. *Thomas, supra.*

"Even if the assistant district attorney had affronted the judge in this case, it does not necessarily follow from *Thomas* that dismissal of the indictments would be a required, or even an appropriate, sanction. We affirmed the dismissal of the complaint in the *Thomas* case, not because the judge had been affronted, although we recognized that and criticized it, but because the same conduct that constituted the affront also resulted in a violation of the defendant's constitutional right to a speedy trial."

*Id.* at 682-683. In *Hinterleitner,* grand jury proceedings had not begun on the date set for the probable cause hearing; the prosecutor simply informed the court that the cases had been approved by the district attorney for direct indictments. Here the grand jury was already investigating, and the Superior Court had become involved in that inquiry. There were thus stronger grounds for nol prossing the complaints than in *Hinterleitner.* Indeed, the *Hinterleitner* court stated that "it would have been better if the decision to seek direct indictments had been made before the date of the scheduled hearing." *Id.* at 684. See *Commonwealth* v. *Raposa,* 386 Mass. 666, 669 n.8 (1982).

There is nothing in Pirrotta's argument that the prosecutor abused the grand jury process in order to obtain a lineup denied by the District Court judge. First, the denial was without prejudice to renewal of the request. Second, a grand jury may legiti-

mately order a lineup and require a suspect to appear in it. *In re Melvin,* 550 F.2d 674 (1st Cir. 1977).

After considering the factors set forth in *Barker* v. *Wingo,* 407 U.S. 514, 530 (1972),[14] the judge concluded that the defendants had not been denied their Sixth Amendment right to a speedy hearing. There was no error. There is no question that the defendants asserted the right. As the judge found, the Commonwealth acted expeditiously. Grand jury proceedings began nine days after the incident, and indictments were returned two weeks later. See *Commonwealth* v. *Hinterleitner,* 391 Mass. at 684. The use of the grand jury was legitimate. No prejudice to the defendants resulted. They were not *entitled* to a probable cause hearing in order to obtain discovery. *Id.* at 681. *Lataille* v. *District Court of E. Hampden,* 366 Mass. 525, 530 (1974). Fournier's argument that material, exculpatory evidence was lost by the Commonwealth between the date of the scheduled probable cause hearing and the trial is not supported by the record. The evidence, a police officer's handwritten notes with respect to the descriptions of the defendants given by the victim, was last seen by the officer twelve days before the scheduled probable cause hearing.

The defendants' argument that they were denied their statutory right to a speedy probable cause hearing is without merit. General Laws c. 276, § 38, requires that probable cause hearings be held "as soon as may be." There is, however, no right to a probable cause hearing. A grand jury indictment and a District Court complaint are "alternative means for establishing probable cause to hold a defendant for trial." *Lataille* v. *District Court of E. Hampden, supra* at 530-531. "The reasoning of the [District Court] judge [in denying the motion for continuance] appears only to have been that if the complaints were to remain alive the probable cause hearing would have to proceed as scheduled." *Commonwealth* v. *Hinterleitner, supra* at 683.

3. *The motions for required findings of not guilty.* Pirrotta argues that there was error in the denial of his motion on the

---

[14] "Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant."

charge of aggravated rape because of insufficient evidence on both identification and lack of consent. Fournier joins in the latter argument. There was no error.

In reviewing the denials of the motions we view the evidence in the light most favorable to the Commonwealth, notwithstanding contrary evidence presented by the defendants, to determine whether that evidence, together with permissible inferences, was sufficient as to each element of the offense charged to have "satisfied a rational trier of fact of each such element beyond a reasonable doubt." *Commonwealth* v. *Latimore,* 378 Mass. 671, 676-678 (1979). "The inferences drawn by the jury need not be necessary or inescapable, as long as they are reasonable, possible, and not unwarranted because too remote from the ordinary course of events." *Commonwealth* v. *Chinn,* 6 Mass. App. Ct. 714, 716 (1978). See *Commonwealth* v. *Beckett,* 373 Mass. 329, 341 (1977). "Whether an inference is warranted or is impermissibly remote must be determined, not by hard and fast rules of law, but by experience and common sense" (footnote omitted). *Commonwealth* v. *Drew,* 4 Mass. App. Ct. 30, 32 (1976).

At the close of the Commonwealth's case,[15] the evidence relevant to these appeals, taken in the light most favorable to the Commonwealth, was as follows.[16] On April 22, 1983, the victim, a private in the United States Army stationed at Fort Devens, and a friend went to the Franklin Club. That evening a band known as "Grand Slamm" was performing at the club. One of the four men in the band was Pirrotta. During the performance the victim sat at a table about three feet away from the bandstand. At the end of the fourth set, the overhead lights in the club were turned on. The victim approached Pir-

---

[15] The motions were made when the Commonwealth rested and were renewed at the close of all of the evidence and after discharge of the jury. See Mass.R.Crim.P. 25(a) & (b), 378 Mass. 896 (1979). We consider the evidence at the close of the Commonwealth's case, as its proof did not deteriorate after that time. See *Commonwealth* v. *Kelley,* 370 Mass. 147, 150 & n.1 (1976); *Commonwealth* v. *Basch,* 386 Mass. 620, 622 n.2 (1982).

[16] Some of the recitation which follows perforce covers the same ground as those findings, previously summarized, which the motion judge made after the suppression hearing.

rotta and asked if he could give her a ride back to Fort Devens. Pirrotta said that she could have a ride back on the band's bus. The victim then spoke with Crowe and Fournier and others in the area near the band's dressing room.

At about 1:00 A.M. the victim left the club and boarded the band's bus. She sat next to Pirrotta in the front part of the bus; the other defendants were also on the bus. Before the bus left the parking lot, the overhead lights were on and the lighting conditions were good. At about 1:30 A.M., the bus started to move. Pirrotta left his seat and moved toward the rear of the bus. Soon after the bus left the parking lot, the victim heard people talking softly and laughing behind her. She then saw the defendants move toward her. Crowe and Fournier each grabbed one of her shoulders, pushing her down on the seat so that her head was under the window and her feet were in the aisle. The victim tried to sit up, but Crowe and Fournier held her down. Fournier then reached behind the victim and unhooked her bra while Crowe held her shoulders down. Looking up, the victim saw Pirrotta standing in front of her. While Pirrotta started to undo her pants, the victim crossed her legs and tensed her body in an effort to keep her legs together. She did not say anything to the defendants or to the several other people who were in the front portion of the bus because she was afraid that the defendants would harm her, and she did not think it would have done any good.[17] Pirrotta then pulled the victim's pants down, pushed her legs apart and had vaginal intercourse with her. The victim, feeling scared and humiliated, tensed up her muscles and tried to sit up, but Crowe and Fournier continued to hold her down. The victim remained

---

[17] Pirrotta argues that the testimony that the victim thought her resistance would be fruitless was struck. While the victim's statement, "I don't think it would have done much good if I would have said anything" was struck, the victim's following testimony was admited without objection.

> Q. "And you didn't yell out to [the people on the bus] in any manner?"
> A. "No."
> Q. "You didn't — did you look at them in an effort to have them come to your aid?"
> A. "No, I didn't think it would do any good."

silent while those standing nearby cheered the defendants on. Eventually she blacked out.

When the victim regained consciousness, she was in the rear of the bus. She became ill and vomited. Someone yelled out, "She's sick, stop the bus." Two people then dressed the victim as the bus came to a stop, carried her from the back of the bus and laid her down in a field. One of the men said, "Let's get out of here," and the bus left the area. The victim later positively identified the defendants in a lineup and at trial.

A rational jury could have found beyond a reasonable doubt that Crowe and Fournier restrained the victim while Pirrotta had intercourse with her. The evidence was sufficient to establish that Pirrotta had sexual intercourse with the victim by force and against her will. See G. L. c. 277, § 39; c. 265, § 22(*a*) & (*b*). "The victim is not required to use physical force to resist; any resistance is enough when it demonstrates that her lack of consent is 'honest and real' [citation omitted]. The jury could well consider the entire sequence of events and acts of all three defendants as it affected the victim's ability to resist" (citations omitted). *Commonwealth* v. *Sherry,* 386 Mass. 682, 688 (1982).

The defendants contend that there was insufficient evidence to show that they had or should have had knowledge of the victim's lack of consent. We think the evidence of the behavior of the victim and the defendants, considered in the light most favorable to the Commonwealth, was sufficient to permit the jury to draw a reasonable inference that the defendants knew or should have known that the victim was not consenting. See *Commonwealth* v. *Lefkowitz,* 20 Mass. App. Ct. 513, 519 n.12, 520 (1985). To the extent that the defendants' argument may be thought to be that the Commonwealth's case failed because of a lack of evidence that the defendants harbored a specific intent that the intercourse be without consent, it is without merit. "The elements necessary for rape do not require that the defendant intend the intercourse be without consent. General Laws c. 265, § 22. No specific intent is required." *Commonwealth* v. *Grant,* 391 Mass. 645, 650 (1984). "The discussion in the *Grant* case, and the frequency with which the

crime of rape has been described in the decisional law of this Commonwealth, lead to the inescapable conclusion that the prosecution has proved rape if the jury concludes that the intercourse was in fact nonconsensual (that is, effectuated by force or by threat of bodily injury), without any special emphasis on the defendant's state of mind. [Citations omitted.] The scienter element of the offense thus equates with the scienter sufficient to convict of most crimes, a general intent." *Commonwealth* v. *Lefkowitz, supra* at 519.

Pirrotta's remaining argument, which has as its cornerstone the victim's "dubious at best" identification testimony, is to no avail. Inconsistencies in the victim's testimony "do not render the testimony legally insufficient." *Commonwealth* v. *McGahee,* 393 Mass. 743, 750 (1985). "[A]ll of her statements are entitled to be considered as probative evidence [citations omitted]. Credibility is a question for the jury to decide; they may accept or reject, in whole or in part, the testimony presented to them [citations omitted]. The prior identifications and those made in court were fully probative despite contradictions in the testimony." *Commonwealth* v. *Fitzgerald,* 376 Mass. 402, 411 (1978).

4. *Admission of Crowe's redacted statement.*[18] Before his arrest, Crowe gave a statement to Detective Morrison of the Shirley police department. During questioning, Crowe stated that he remembered that the victim was on the bus, that she voluntarily took her shirt off and that he later heard someone yell that she had her pants off. Crowe made further statements which incriminated the codefendant Little. In response to Little's pretrial motion to sever, the Commonwealth agreed to introduce a redacted statement at trial, eliminating the statements which incriminated Little. The motion to sever was then denied. At trial, Morrison testified only that Crowe stated that while on the bus the victim took off her shirt and that some time later someone yelled that she had her pants off.

---

[18] Since the judge dealt with the substance of the issue, so do we. We do not, therefore, reach the argument that the defendants are procedurally barred from raising the question because of their failure to file at any time a written motion for severance. See Mass.R.Crim.P. 9(d)(2), 378 Mass. 860 (1979).

Pirrotta argues that the introduction of Crowe's redacted statement created a *Bruton* problem which caused prejudicial error. *Bruton* v. *United States*, 391 U.S. 123 (1968), prohibits the introduction in evidence of a defendant's statement inculpating a codefendant where the defendant does not take the stand and expose himself to cross-examination. A statement may be inculpatory under *Bruton* where it "neither names nor plainly refers to a codefendant," but the codefendant "otherwise easily can be connected with the statement." *Commonwealth* v. *Moran*, 387 Mass. 644, 653 n.4 (1982). However, where the inculpation is weak, careful limiting instructions by the judge will be sufficient to protect the interests of the codefendant. *Commonwealth* v. *LeBlanc*, 364 Mass. 1, 8-9 (1973). *Commonwealth* v. *Clark*, 5 Mass. App. Ct. 673, 676 (1977).

Here, Crowe's statement that someone yelled that the victim had her pants off did not directly inculpate any of the defendants. The statement does not suggest that anyone took the victim's pants off. Indeed, when considered along with Crowe's previous statement that the victim herself removed her shirt, the strongest inference to be drawn is that she also voluntarily took off her pants. Pirrotta, however, argues that the statement inculpated him when considered in light of the victim's testimony that he removed her pants. Yet the adverse effect of Crowe's statement on Pirrotta, if any, was so indirect and incidental that the judge's instructions limiting the statement as evidence only against Crowe[19] were sufficient to protect Pirrotta from possible prejudice. *Commonwealth* v. *Clark*, *supra*.

Crowe argues that the admission of the redacted statement violated the rule of verbal completeness. Where a statement has been offered against a defendant as an admission, the rule of verbal completeness allows the defendant to offer any other part of that same statement that explains or disproves the claimed admission. *Commonwealth* v. *Watson*, 377 Mass. 814,

---

[19] The trial judge instructed the jury that "any conversations between . . . [O]fficer [Morrison] and Mr. Crowe can be considered only as far as Mr. Crowe's indictments are concerned. It is not to be considered for any purpose as far as the other defendants' indictments are concerned."

832 (1979). The rule is limited; the defendant cannot compel the admission of an entire statement simply because the Commonwealth offers a part of it. *Id.* at 833. Rather, it is necessary that the portion of the statement that the defendant seeks to introduce qualify or explain the segment introduced by the Commonwealth. "[The defendant] had no right to use his declarations in his own favor in regard to distinct and independent subjects of inquiry, even though these subjects were of a kindred character and related to the same general issue." *Id.* at 827, quoting from *Commonwealth* v. *Russell,* 160 Mass. 8, 10 (1893).

Here the statements that were excluded, while made at the same time as the admitted statement, did not furnish an explanation or qualification. Crowe's statement placed him on the bus and recorded his observations of the victim. The excluded portion concerned statements that Little made to Crowe regarding Little's involvement in the incident. The excluded testimony was not admissible under the rule of verbal completeness.

5. *Fresh complaint.* Sergeant Kimberly Ferrier (a charge of quarters officer at Fort Devens on the morning of the incident) testified to the victim's rape complaint to her when the victim returned to Fort Devens at about 3:00 A.M. on April 23, 1983.[20] Nancy Taylor, rape investigation officer with the Ayer police, similarly testified to her conversation with the victim at about 3:30 A.M. on the same morning, as did a physician who examined the victim at about 5:30 A.M. The judge allowed this testimony as evidence of fresh complaint. He gave repeated instructions (as each fresh complaint witness testified and in the final instructions) to the jury that they could consider the evidence solely to corroborate the victim's claim and that they could reject the evidence if they did not find that the complaints were reasonably prompt.

Pirrotta and Fournier contend that the admission of this evidence was error because the complaints were not made

---

[20] The incident occurred between 1:30 A.M., when the band's bus left the Franklin Club parking lot, and 2:00 A.M., when the victim was put off the bus.

promptly. While, in the period between the time the victim was dropped off the bus and the time she complained of a rape to Sergeant Ferrier, the victim had seen and conversed with five men (the clerk at the motel to which she went after being put off the bus, an Ayer police officer and a sentry and two military police officers from Fort Devens), she had not reported a rape to any of them. The victim testified that she did not say anything about rape to these men because she did not know them, and she was afraid of unfamiliar males.

A complaint of a sex crime made by a victim within a reasonable period of time after the commission of the offense is admissible as corroboration of the victim's testimony under the fresh complaint doctrine. See *Commonwealth* v. *McGrath*, 364 Mass. 243, 246-250 (1973); *Commonwealth* v. *Sherry*, 386 Mass. 682, 690-691 (1982); *Commonwealth* v. *King*, 387 Mass. 464, 473-474 (1982). Here the judge implicitly made a preliminary finding that the complaints were sufficiently prompt to be admissible as fresh complaints. See *Commonwealth* v. *Cleary*, 172 Mass. 175, 176-177 (1898). The judge then gave proper limiting instructions to the jury. There was no abuse of discretion. The ultimate weight to be given to the evidence was clearly and properly left to the jury.

6. *Excluded evidence.* Louis Festo, a guitar player in the band, testified, on direct examination by counsel for Little, that he was on the bus for a short while before it left the parking lot. He stated that while on the bus, Pirrotta showed him a note which Pirrotta said the victim had given to him. On objection by the Commonwealth, the judge excluded that testimony as well as Festo's anticipated testimony as to the contents of the note. Little's counsel made an offer of proof that Pirrotta had given Festo a note, that Festo read it, that he would be able to testify to its contents, and that he gave it back to Pirrotta and had not seen it since that time.

On appeal, Pirrotta contends that his statement to Festo and the contents of the note were admissible as evidence of Pirrotta's state of mind. See Liacos, Massachusetts Evidence 348-350 (5th ed. 1981 & Supp. 1985). In addition, Pirrotta argues that his statement was admissible as an excited utterance.

Neither of these grounds was pointed out (indeed, no ground was mentioned) to the trial judge, nor do we think either should have been apparent to him without specific reference. See *Commonwealth* v. *Rodwell*, 394 Mass. 694, 697 (1985). The judge's comments at the time indicate that he was not aware of any such ground. In any event, there was no error in the exclusion of the evidence for the reasons, if no other, that Pirrotta's statement, without more, was not relevant to his state of mind (if his state of mind at the time was relevant at all, see the discussion of intent in part 3, *supra*), and the offer of proof was inadequate both as to the contents of the note and as to Pirrotta's behavior at the time. See Liacos, Massachusetts Evidence 78-79, 350-352 (5th ed. 1981).

7. *The committal of a witness on a presumption of perjury.* Near the end of the defendants' case, during direct examination by Pirrotta's counsel, one Bette Vancour Morrison testified that during the night of the incident she was at the club and saw the victim in the back of the bar having oral sex with a young man. On cross-examination, Morrison testified that on April 30, during an interview with Shirley police Detective William Morrison, she reported that observation. After the completion of her testimony, the judge dismissed the jury and questioned the witness. She stated that she told Detective Morrison, in the presence of her roommate, that she had seen the victim having oral sex. The judge then called Detective Morrison, who testified that he did question Ms. Morrison on April 30. However, Detective Morrison stated that no one else was present during the interview and that Ms. Morrison never mentioned observing the victim having oral sex. The judge then ruled that he had a reasonable presumption that Ms. Morrison had committed perjury and ordered her taken into custody and bound over to the grand jury for consideration of an indictment for perjury. See G. L. c. 268, § 4.

Pirrotta and Fournier argue that the judge acted improperly, with the effect of inhibiting the defendants and their witnesses in presenting a defense.

The judge expressly acted within the authority granted by G. L. c. 268, § 4,[21] when he concluded that Ms. Morrison's testimony created a reasonable presumption of perjury. Detective Morrison's testimony directly contradicted the testimony of Ms. Morrison. Furthermore, the judge "had an opportunity to observe the witness's demeanor and 'had a right to use his knowledge of human nature and his judicial experience in determining the character of the testimony.'" *Commonwealth* v. *Michel*, 367 Mass. 454, 462 (1975), quoting from *Blankenburg* v. *Commonwealth*, 272 Mass. 25, 34 (1930), cert. denied, 283 U.S. 819 (1931).

There is nothing in the record to support the allegation of the defendants that the judge's action had a chilling effect on the defendants and their witnesses. The defendants did not file any affidavit which in any way indicated that the judge's action prevented or inhibited testimony. *Webb* v. *Texas*, 409 U.S. 95 (1972), relied on by the defendants, is inapposite. There, the trial judge singled out the sole witness for the defendant and admonished him on the dangers of perjury. The judge implied that he expected the witness to lie and that if he should lie, he would be prosecuted and probably be convicted of perjury, the prison sentence he was then serving would be extended by his perjury sentence, and his chances for parole would be damaged. *Id.* at 96. The witness then refused to testify. The Court concluded that the effect of the judge's threatening remarks "effectively drove that witness off the stand" and thus violated the defendant's due process rights. *Id.* at 98. Here, the defendants' claim of a chilling effect is, at best, speculative.

---

[21] "If it appears to a court of record that a party or a witness who has been legally sworn and examined, or has made an affidavit, in any proceeding in a court or course of justice has so testified as to create a reasonable presumption that he has committed perjury therein, the court may forthwith commit him or may require him to recognize with sureties for his appearance to answer to an indictment for perjury; and thereupon the witnesses to establish such perjury may, if present, be bound over to the superior court, and notice of the proceedings shall forthwith be given to the district attorney."

8. *Jury instructions*. Crowe requested that the judge give the following instruction to the jury:

> "[The jury] may not find the defendant Thomas Crowe guilty of rape or aggravated rape unless they are convinced beyond a reasonable doubt that he held down the alleged victim . . . and that he did it for the purpose of compelling her to have sexual intercourse against her will."

Crowe argues that the instruction was necessary to prevent the jury, after concluding that the victim had been raped at some time on the bus, from finding him guilty merely because he was on the bus at the time of the rape. However, that danger was avoided by the judge's clear and comprehensive instructions on joint venture. The judge instructed the jury:

> "In order to find that a person was part of a joint venture, you must find, based on the evidence that you have heard, number one: That that person rendered aid in furtherance of the crime. Presence alone is not enough. And number two: That the person aided with the intent required for the crime or crimes. It is for you to decide whether the Commonwealth has proved these elements beyond a reasonable doubt. . . . The fact that an individual was present during the commission of a crime does not constitute aid for the purpose of joint venture. Presence with knowledge of the planned act is insufficient alone to convict a person for the acts of another. Mere presence at the commission of a wrongful act, and failure to take affirmative steps to prevent it, does not render a person liable as a participant."

"The judge was not required to instruct the jury in the precise language requested by the defendant. It is enough if the instructions were otherwise adequate, although not making specific reference to the particular facts which the defendant asked the judge to state or emphasize." *Commonwealth* v. *Harris*, 376 Mass. 201, 208 (1978). See *Commonwealth* v. *Sherry*, 386 Mass. 682, 697 (1982). There was no error.

Crowe and Pirrotta allege error in the following instruction:

> "In [determining whether the sexual intercourse was com-
> pelled by force and against her will or by threat of bodily
> injury and against her will] you, the jury, may consider
> evidence of violence, struggle or outcries. The weight
> and credibility of this evidence is solely for your determi-
> nation. A lack of evidence of struggle or violence, how-
> ever, does not imply consent, because in certain cir-
> cumstances it might not be possible. If the person submit-
> ted because of fear of immediate serious bodily harm, it
> is not consent. A person has to be free to exercise his or
> her will without any restraint. So if there is some interven-
> ing restraint due to fear, drugs or alcohol, unconsciousness
> or other causes, there can be no consent. The simplest
> way to put it is, was the person willing or was there
> compulsion."

At trial, the victim testified to two incidents of rape. The
first involved Crowe, Fournier, Pirrotta and Little. After the
first incident, the victim lost consciousness. The second inci-
dent, which allegedly involved Little and an unidentified man,
began while the victim was unconscious.

Crowe argues that the instruction on unconsciousness was
highly prejudicial to him because although it "was flawless as
an abstract statement of law," it did not apply to the facts of
his case. Crowe suggests that on the basis of this instruction
the jury could have convicted him even if they believed only
the portion of the victim's testimony about being raped while
unconscious.

There was no error. We consider the instructions as a whole.
*Commonwealth* v. *McInerney*, 373 Mass. 136, 149 (1977).
*Commonwealth* v. *Silva*, 388 Mass. 495, 507 (1983). *Common-
wealth* v. *Souza*, 15 Mass. App. Ct. 740, 741 (1983), *S.C.*
390 Mass. 813 (1984). In addition to the instruction isolated
by the defendant, the judge gave the instruction on joint ven-
ture, set forth above, as well as the following:

"It is your duty to give separate personal consideration to the case of each individual defendant. When you do so you should analyze what the evidence in the case shows with respect to that individual, leaving out of consideration entirely any evidence admitted solely against some other defendant or defendants. Each defendant is entitled to have his case determined from evidence as to his own acts and statements and conduct, and any other evidence in the case which may be applicable to him under the theory of joint venture."

Pirrotta attacks the consent instruction on two grounds. As neither argument was made to the trial judge, the claims are reviewed only to determine if there is a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Freeman*, 352 Mass. 556, 563-564 (1967). We conclude that there is no such risk.

Pirrotta first claims that the instruction is flawed because it fails to refer to the reasonableness of the victim's fear or degree of resistance. Pirrotta then argues that the charge on alcohol erroneously suggested to the jury that the victim's consumption of alcohol could per se negate consent.[22]

Neither argument has merit. When the instructions are read as a whole, they are not misleading. Both of Pirrotta's claims are silenced by the instruction the judge gave immediately following the one under review:

"The Commonwealth must further prove beyond a reasonable doubt that a reasonable man in a defendant's circumstances would know that [the victim] did not consent to the acts of sexual intercourse, if you find in fact that acts of sexual intercourse took place, and that she did not consent."[23]

Fournier contends that the judge erroneously failed to instruct the jury to consider *each* defendant's mental state. He argues

---

[22] The victim testified that she had had four beers that night.

[23] See *Commonwealth* v. *Lefkowitz*, 20 Mass. App. Ct. 513, 520 (1985).

that the proper instruction would have required the Commonwealth to prove beyond a reasonable doubt what each defendant reasonably knew or should have known and not what a "reasonable man in a defendant's circumstances" would have known. There is no meaningful difference between the requested instruction and the one given. Furthermore, the judge's comprehensive instructions, including those on joint venture, made particular reference to the individual consideration that the jurors were required to give to each defendant's case.

9. *Sentencing.* Pirrotta argues that the trial judge relied exclusively on "political considerations" when he imposed sentence and thus abused his sentencing power.[24] The record belies the contention. The judge ordered and thoroughly examined a presentence report, received numerous letters written by family and friends of the defendants on their behalf, heard extensive argument of counsel on the issue of the appropriate sentence, received sentencing memoranda from the Commonwealth and Pirrotta, and heard testimony of a character witness on behalf of Pirrotta. In the circumstances, "[f]or any relief from the alleged severity of the sentences [the defendant's] recourse . . . is to the Appellate Division of the Superior Court under G. L. c. 278, §§ 28A-28[C]." *Commonwealth* v. *Whitehead,* 379 Mass. 640, 664 (1980).

10. *Denial of motion for a new trial.* There was no error in the denial, without an evidentiary hearing, of Pirrotta's motion (joined in by Crowe and Fournier) for a new trial. It is within the judge's discretion to rule on a motion for a new trial without a hearing if no substantial issue is raised by the motion or accompanying affidavits. *Commonwealth* v. *Stewart,* 383 Mass. 253, 257 (1981). Mass.R.Crim.P. 30(c)(3), 378 Mass. 901 (1979). "The decision on a motion for a new trial, as well as the decision whether to decide the motion on the basis of affidavits or to hear oral testimony, is left largely to the sound

---

[24] Before imposing sentence, the judge commented in strong and approving terms on what he perceived to be changing societal attitudes toward rape in general and gang rape in particular. The judge thought the verdicts reflected current attitudes. Pirrotta was sentenced to eight to twelve years at the Massachusetts Correctional Institution, Walpole (now Cedar Junction).

discretion of the judge." *Commonwealth* v. *Stewart, supra* at 257.

"In determining whether a 'substantial issue' meriting an evidentiary hearing under rule 30 has been raised, we look not only at the seriousness of the issue asserted, but also to the adequacy of the defendant's showing on the issue raised." *Id.* at 257-258. On appeal, Pirrotta argues that it was an abuse of discretion to deny the motion without a hearing in the face of Pirrotta's allegations that Little would testify at a hearing that it was he and not Pirrotta who raped the victim. No affidavit of Little was submitted, and the judge found that there was no showing that Little would appear or, if he did, what the content of his testimony would be. Even if an affidavit of the acquitted codefendant had been submitted, it would have been "the weakest sort of evidence," and the judge would not have been required to believe it. *Commonwealth* v. *Grace,* 370 Mass. 746, 752 (1976). See *Commonwealth* v. *Little,* 384 Mass. 262, 269 (1981). The issue raised was not supported by adequate evidence.

*Judgments affirmed.*

*Order denying motions for new trial affirmed.*